UNITED STATES of America, Plaintiff,

v.

BALTIMORE AND OHIO RAILROAD,
et al., Defendants.

Crim. No. 81–396.

United States District Court,
District of Columbia.

April 15, 1982.

James R. Weiss, Kevin R. Sullivan, Claudia Silverman, Coralie Chun Matayoshi, Antitrust Div., Dept. of Justice, Washington, D. C., for U. S.

Donald L. Flexner, Richard McMillan, Jr., William Randolph Smith, Todd D. Peterson, Crowell & Moring, Washington, D. C., for Baltimore & Ohio Railroad Co., Inc. and Chesapeake & Ohio Railway Co., Inc.

Kenneth C. Anderson, James V. Dick, Sean F. Boland, Timothy Bergin, Squire, Sanders & Dempsey, Washington, D. C., for Bessemer & Lake Erie Railroad, Inc.

Richard J. Flynn, Thomas H. Yancey, Sidley & Austin, Washington, D. C., for Norfolk & Western Railway Co., Inc.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this proceeding several major railroad companies are charged with criminal conduct in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (1977). The defendants, Baltimore and Ohio Railroad Company, Inc. (B&O), Bessemer and Lake Erie Railroad Company, Inc. (B&LE), Chesapeake and Ohio Railway Company, Inc. (C&O), and Norfolk and Western Railway Company, Inc. (N&W), are charged with engaging in a combination and conspiracy in unreasonable restraint of trade and commerce which inhibited or eliminated competition among dock companies and motor and rail carriers involved in the transshipment of iron ore on Lake Erie and from Lake Erie docks to the steel mills. A grand jury empanelled by the United States District Court for the District of Columbia returned on October 13, 1981, a single-count indict-

ment against the four rail carriers,[1] charging antitrust law violations from 1956 to 1978.

The defendants responded to the indictment by filing a series of motions: (1) a joint motion of all defendants to dismiss the indictment for improper venue or, alternatively, transfer of the proceeding to the Northern District of Ohio; (2) a motion by B&LE to dismiss the indictment for duplicity and misjoinder or, alternatively, severance of defendants and separate trials; (3) a motion by N&W to sever its trial and transfer the proceeding to the Western District of Virginia; (4) a joint motion of all defendants to dismiss on the ground that the conduct alleged in the indictment is immune from antitrust prosecution or, alternatively, referral of the immunity question to the Interstate Commerce Commission (ICC); and (5) a joint motion of all defendants for a pretrial ruling on whether a *per se* or rule of reason analysis is appropriate for this case.

For the reasons set forth below, this Court rejects the several motions of the defendants and also determines that the *per se* standard is appropriate for the trial of this proceeding.

## BACKGROUND

The government's allegations in the indictment and bill of particulars can be briefly summarized. Most of the iron ore supplied to mills in the steelmaking belt encompassing parts of Ohio, Pennsylvania, West Virginia and Kentucky is mined in the states adjacent to Lake Superior and Lake Michigan—Wisconsin, Michigan and Minnesota. Transport of the ore from mines in these states to the mills is a three-step process: rail carrier to the Great Lakes, across the lakes by freighters, and rail carrier to the mills.

The conspiracy alleged in the indictment involves the second and third steps of this movement. Traditionally, heavy cranes called "huletts" were positioned on Lake Erie docks to transfer unprocessed ore from the freighters to rail cars for transport to the mills. Except for a few steel companies operating lakeside mills, the railroads owned all of the Great Lakes docks which contained huletts. In the early 1950's, however, a new technology was developed for conversion of unprocessed ore into small pellets. This method permitted shipment of iron ore in a new type of freighter which discharged the pellets directly from the vessel to the rail cars through the use of a series of conveyor belts. These new ships, called "self-unloaders," did not require use of the huletts and could unload iron ore at virtually any stable dock.

This development posed a threat to the defendants' domination of the iron ore unloading business. The government claims that, in response, the defendants conspired at a meeting in Cleveland, Ohio, in 1956 to block use of the self-unloaders. Unlike many criminal conspirators, who might secretively plot their illegal activities in a barber shop,[2] a luncheonette,[3] or a restaurant,[4] the meeting in Cleveland, and others that followed over the ensuing 22 years, took place in various industry conference rooms with an official stamp of approval from the ICC.[5]

1. The indictment also named a fifth defendant, Consolidated Rail Corporation (Conrail). The Court accepted a nolo contendere plea from Conrail on November 12, 1981. In addition, various persons or corporations, not made defendants, allegedly participated as co-conspirators in the offense charged (Ind. ¶ 7).

2. *United States v. Gibbons*, 602 F.2d 1044 (2d Cir,), *cert. denied*, 444 U.S. 950, 100 S.Ct. 421, 62 L.Ed.2d 319 (1979).

3. *Garardo v. Commissioner of Internal Revenue*, 552 F.2d 549 (3d Cir. 1977).

4. *United States v. Swiderski*, 593 F.2d 1246 (D.C.Cir.1978), *cert. denied*, 441 U.S. 933, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979).

5. The ICC authorized the collusive setting of rates under section 5a of the Interstate Commerce Act (IC Act), 49 U.S.C. § 5b (1976), recodified in 1978 at 49 U.S.C. § 10706(b) (1981). The effect of the ICC approval is discussed *infra* at pp. 10–15.

The indictment charges that the defendants' collusive actions were illegal under the antitrust laws, despite Commission authorization, because the defendants plotted to "inhibit" or "eliminate" competition from non-railroad-owned docks and from motor carriers. The defendants achieved this goal by filing tariffs with the Commission which extended iron ore hauling rates exclusively to railroad-owned docks. In addition, the indictment recites that the defendants charged the same fees for handling iron ore from self-unloaders as from the freighters even though fewer services were necessary, and that the defendants refused to lease railroad-owned dock space to a company which sought to handle iron ore from self-unloaders. The defendants also agreed to forego the right of independent action with respect to the charges for handling iron ore from self-unloaders without seeking or obtaining ICC approval, as required by the 5a agreement (Ind. ¶ 22(a), (b), 23(a)–(f)).

In addition to trying to block competition from non-railroad-owned docks, the defendants allegedly took steps to "inhibit or eliminate competition from motor carriers in the transportation of iron ore from docks on Lake Erie to steel mills" (Ind. ¶ 22(c)). They accomplished this objective by "refraining from independently or collectively reducing line-haul rates for rail movements or iron ore in order to meet truck competition" and by taking steps, such as requiring motor carriers to pay an arbitrary usage charge, designed to bar the trucking of iron ore from Lake Erie docks (Ind. ¶ 23(g)–(i)).

## LEGAL ANALYSIS

### A.

*Joint Motion to Dismiss for Improper Venue or to Transfer.*

█ 1. *Motion to dismiss.* Venue, for purposes of "continuing offenses" such as a conspiracy, is governed by 18 U.S.C. § 3237. In relevant part the section provides that "any offense against the United States begun in one district . . . may be inquired of and prosecuted in any district in which such offense was begun, continued, or complet-

ed." This language restricts venue to the district in which the conspiracy was formed or where one or more overt acts in furtherance of the conspiracy occurred. *Hyde v. United States*, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912); *United States v. Anderson*, 611 F.2d 504 (4th Cir. 1979).

█ The government's voluntary bill of particulars alleges that two types of overt acts in furtherance of the conspiracy occurred in this District. First, the defendants filed several tariffs and amendments thereof with the Commission (B of P ¶¶ 3, 10, 11, 45). Later, on July 6, 1976, the defendants held a meeting in Washington, D.C., to discuss truck competition (B of P ¶ 50). The defendants claim that, for several reasons, these acts cannot provide the basis for venue in this District. Thus, they seek dismissal for lack of venue pursuant to Article III, section 2, cl. 3 and the Sixth Amendment of the United States Constitution and Rule 18 of the Federal Rules of Criminal Procedure.

The railroads first advance the argument that the acts which allegedly establish venue were immunized by section 5a of the Interstate Commerce Act and, as immune acts, they cannot provide the basis for venue. *Caribe Trailers Systems v. Puerto Rico Maritime*, 475 F.Supp. 711, 719 (D.D.C. 1979). However, as will be seen below, this Court agrees with the government. Section 5a does not immunize rate-making agreements which are intended to inhibit or eliminate competition. Because the tariffs and amendments were allegedly filed for anti-competitive and predatory reasons, the filings are not immune from the prohibitory reach of the Sherman Act and thus constitute "overt acts" for venue purposes.

The railroads also contend that the tariff filings cannot establish venue because they were made under legal compulsion. They cite section 6(1) of the IC Act, 49 U.S.C. § 6(1), which provides that common carriers subject to the jurisdiction of the ICC cannot offer rail services unless rates and charges are filed with the ICC. The argument, however, confuses procedure with substance; nothing in the Act mandates the

filing of a tariff which furthers an illegal purpose. The filing of a tariff which is the product of an illegal conspiracy is no more "legally compelled" than is, for instance, the filing of false and misleading documents with the Securities and Exchange Commission. *See e.g., SEC v. National Student Marketing Corp.*, 360 F.Supp. 284, 292–93 (D.D.C.1973).[6]

▪ A third argument advanced is that venue is lacking because none of the acts asserted as the basis for venue took place within the District of Columbia during the five-year limitations period prescribed by 18 U.S.C. § 3282. The defendants cite two cases for support of their position, *United States v. Luros*, 243 F.Supp. 160 (N.D. Iowa), *cert. denied sub nom., Luros v. Hanson*, 382 U.S. 956, 86 S.Ct. 433, 15 L.Ed.2d 361 (1965), and *United States v. Kane*, 243 F.Supp. 746 (S.D.N.Y.1965). Even if they are correct in their readings of these cases, this Court does not concur. The law is clear: "[V]enue as to prosecution of all members of a conspiracy lies either in the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." *United States v. Overshon*, 494 F.2d 894, 900 (8th Cir.), *cert. denied*, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). This principle stems from the basic character of a conspiracy as a continuing crime involving conduct over a period of time and, very often, in more than one place. Imposition of a limitations requirement would bifurcate a conspiracy into two sets of events—those within the limitations period and those without—and thereby conflict with the fundamental nature of a "continuing crime." Absent an explicit congressional mandate, such an additional hurdle for establishing venue in a conspiracy case should not be imposed.

Moreover, even if the defendants are correct in their view of the venue statute, the government has, in fact, pointed to the filing of an ICC tariff in this District in March 1978. That filing, within the limitations period, constitutes an overt act in furtherance of the conspiracy, and all of the defendants are therefore chargeable with it, including those who took no part in its filing. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 253–54, 60 S.Ct. 811, 858, 84 L.Ed. 1129 (1940).

▪ *2. Motion to transfer.* The defendants have moved alternatively to transfer this proceeding to the Northern District of Ohio under Rule 21(b) Fed.R.Cr.P.:

> For the convenience of parties and witnesses, and in the interest of justice, the court upon motion of the defendant may transfer the proceeding as to him or any one of the counts thereof to another district.

The factors applicable for consideration of a motion under this rule include:

> (1) location of corporate defendant; (2) location of possible witnesses; (3) location of events likely to be in issue; (4) location of documents and records likely to be involved; (5) disruption of defendant's business unless the case is transferred; (6) expense to the parties; (7) location of counsel; (8) relative accessibility of place of trial; (9) docket condition of each district or division involved; and (10) any other special elements which might affect the transfer.

*Platt v. Minnesota Mining Co.*, 376 U.S. 240, 243–44, 84 S.Ct. 769, 771, 11 L.Ed.2d 674 (1964) (citation omitted).

The standards for assessing these factors have been expressed in a number of opin-

---

**6.** The defendants concur that when material *false* statements are made in filings with government agencies, venue will lie in the district in which the agency received the filing, since the statute makes the filing of such statements illegal. *See Travis v. United States*, 364 U.S. 631, 81 S.Ct. 358, 5 L.Ed.2d 340 (1961). However, they claim that a different analysis applies in this case because the filings contain no material false statements. The distinction is not a valid one. *Travis* and similar cases focus on statements within the filing, while this case focuses on the purpose for which the filing was made. Just as false statements can violate a particular statute, so too can tariff filings which are the product of collusive rate-making violate the Sherman Act. In either case the filing with the federal agency properly gives rise to venue in the district in which the filing was made.

ions. Judge Weinfeld in *United States v. U. S. Steel Corp.*, 233 F.Supp. 154, 157 (S.D. N.Y.1964), stated:

> As a general rule a criminal prosecution should be retained in the original district. To warrant a transfer from the district where an indictment was properly returned it should appear that a trial there would be so unduly burdensome that fairness requires the transfer to another district of proper venue where a trial would be less burdensome . . . .

Similarly, citing *U. S. Steel*, Judge Gasch of this District further articulated the standards to be applied to a Rule 21(b) motion:

> [S]ound judicial administration and the need for efficient handling of the prosecuting attorney's work load suggest that only rarely and for good cause should a prosecution be withdrawn by a judicial act from the court in which it was brought . . . . This is especially true where, as in this case, government counsel has carried it before the Grand Jury. Accordingly, to warrant a transfer the defendant must demonstrate and the Court must be satisfied that the prosecution in the district where the indictment was properly returned will result in a substantial balance of inconvenience to himself.

*United States v. Jones*, 43 F.R.D. 511, 514 (D.D.C.1967).

This Court finds that the inconvenience to the defendants is insufficient under these standards to warrant transfer. A showing has been made that most, if not all, of the relevant documents are located in this District. Although defendants have argued that the great majority of their witnesses reside in the Northern District of Ohio or in locations closer to Cleveland than to Washington, D.C., they have not demonstrated to this Court's satisfaction that any witness would be so greatly inconvenienced by a trial here that this matter should be transferred. Moreover, the "bare assertion that a large number of witnesses [from another jurisdiction] will be needed at trial is not sufficient to demonstrate the preponderance of inconvenience necessary to warrant a transfer." *United States v. Jones*, 43 F.R.D. at 514.

Counsel for all parties are located in this District, and, thus, although a large number of witnesses reside in Ohio, it is by no means clear that the expense to the defendants would be greater here than in Cleveland. In any event, the size of the expense concerns the Court less than whether the defendants can bear the expense, *United States v. Luros*, 243 F.Supp. at 175, and the defendants have made no showing that trial in this District would be excessively costly to them.

The other factors also do not support transfer. Although two of the four defendants—B&O and C&O—share headquarters in Cleveland, N&W is headquartered in Roanoke, Va., and B&LE is headquartered in Pittsburgh. The District of Columbia is clearly an accessible location for the defendants in these cities. There is no showing that the defendants' business would be seriously disrupted by a trial here. While all but one of the meetings at issue took place outside of the District of Columbia, the instruments of the alleged conspiracy—the tariffs—were filed within this District. Finally, the defendants do not claim a significant difference in court congestion between the proposed transferor and transferee districts.

In sum, as Judge Weinfeld noted in *U.S. Steel Corp.*, 233 F.Supp. at 157:

> [E]very litigation, particularly a criminal prosecution, imposes burdens upon a defendant and brings in its wake dislocation from normal occupational and personal activities . . . . But mere inconvenience, interference with one's routine occupational and personal activities, and other incidental burdens which normally follow when one is called upon to resist a serious charge do not *ipso facto* make the necessary showing that a transfer is required in the interest of justice.

### B.

*Bessemer and Lake Erie's Motion to Dismiss for Duplicity and Misjoinder or Severance of Defendants and Separate Trials; Norfolk and Western's Motion to Sever.*

■ B&LE contends that the indictment alleges separate and distinct conspiracies

and since it is duplicitous it should be dismissed. It claims that three conspiracies are involved: (1) to deny iron ore commodity rates to private docks, (2) to maintain and stabilize railroad dock handling charges, and (3) to restrain competition from land carrier transportation. For these reasons it has moved to dismiss the indictment.

However, a fair reading suggests that the indictment, rather than citing several conspiracies, alleges a single continuous conspiracy to maintain prices and restrict competition. A single-count indictment charging a number or variety of acts is not duplicitous. "[N]either a multiplicity of objects nor a multiplicity of means converts a single conspiracy into more than one offense." *May v. United States*, 175 F.2d 994, 1002 (D.C.Cir.), *cert. denied*, 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949). *See also, United States v. Hubbard*, 474 F.Supp. 64, 71–72 (D.D.C.1979); *United States v. Mitchell*, 397 F.Supp. 166, 171 (D.D.C.1974), *aff'd on other grounds*, 559 F.2d 31 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). The misjoinder argument as the basis for dismissal under Rule 8(b), Fed.R.Cr.P., likewise, is unwarranted and lacking in merit. There is only one conspiracy alleged in this case.

█ B&LE and N&W also seek severance of their trials. Severance under Rule 14, Fed.R.Cr.P., is required to prevent "undue prejudice." However, it is a well-established proposition that, where possible, defendants jointly indicted and charged with the same offense should be tried together. *United States v. Slade*, 627 F.2d 293, 309 (D.C.Cir.), *cert. denied sub nom., Johnson v. United States*, 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980). That policy is particularly strong in conspiracy cases and sever-

ance will be granted only upon a compelling showing of possible prejudice.

At this point, the showing of possible prejudice is not compelling. The two defendants merely argue that they were far less involved than the other railroads in the alleged conspiratorial activities. N&W also claims that it did not join the alleged conspiracy until more than 10 years after its inception. These bare claims are insufficient to warrant severance. Nor is there an indication or sufficient showing that the defenses of either defendant will be antagonistic to those of the other defendants. *Cf. id.* If during the course of trial there is a "dramatic disparity of evidence," then "any prejudice caused by joinder is best dealt with by instruction to the jury to give individual consideration to each defendant." *United States v. Slade*, 627 F.2d at 309. In addition, if further pretrial proceedings indicate a strong possibility of prejudice, then the Court would be justified in granting appropriate relief.[7]

### C.

*Joint Motion to Dismiss: The Alleged Criminal Conduct Is Immune from Antitrust Prosecution, or Referral of the Immunity Question to the Interstate Commerce Commission.*

1. *Immunity from antitrust prosecution.* The antitrust laws and the various regulatory statutes serve conflicting goals: while the former promote competition, the latter restrain competition.[8] As a result, in situations similar to that of the railroads in this proceeding, defendants have frequently argued that the pervasive regulation of a particular industry forecloses and bars an antitrust prosecution.[9] This is another such case.

---

7. N&W's additional motion, to transfer the proceedings to the Western District of Virginia, was conditioned upon the granting of its severance motion. Any discussion of that motion is therefore unnecessary.

8. See Judge Harold Greene's careful and considered analysis of the tension between the antitrust and the regulatory statutes in *United*

*States v. American Telephone and Telegraph Co.*, 461 F.Supp. 1314, 1321 (D.D.C.1978).

9. *See, e.g., California v. Federal Power Commission*, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962) (natural gas production); *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (generation and transmission of electric power); *United States v. Philadelphia National Bank*, 374 U.S.

Section 5a of the Interstate Commerce Act, enacted in 1948 as part of the Reed-Bulwinkle Act,[10] was intended to insure that railroads could form organizations called rate bureaus in order to meet and collectively agree upon rates, routes and divisions of revenue (Ind. ¶ 15). Section 5a(9) explicitly makes such collective actions immune from the operation of the antitrust laws:

> Parties to any agreement approved by the Commission under this section and other persons are . . . *relieved from the operation of the antitrust laws* with respect to the making of such agreement, and with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission.

49 U.S.C. § 5b(9) (1976) (emphasis added).

The ICC approved the defendants' rate bureau agreement in 1950. The terms and provisions are found in *Eastern Railroads—Agreements*, 277 ICC 279 (1950). The section 5a agreement remained in effect throughout the period relevant to the conspiracy. Hence, the defendants claim that they are immune from the operation of the Sherman Act.

The case law and history of the Reed-Bulwinkle Act indicates, however, that section 5a does not immunize from the operation of the antitrust laws rate bureau agreements which are predatory, coercive, or discriminatory. Our own Circuit Court stated as much in *Atchison, Topeka and Santa Fe Railway Co. v. Aircoach Transport Ass'n*, 253 F.2d 877 (D.C.Cir.1958), *cert. denied*, 361 U.S. 930, 80 S.Ct. 372, 4 L.Ed.2d 354 (1960) ("*Aircoach*"). There, a group of railroads claimed section 5a immunity in submitting package bids for military transport business even though the railroads' agreement was designed to inhibit airline competition. The court's reactions and conclusions were clearly stated:

> Even though it should be found in the end that the practices as such have been validly immunized by section 5a approved agreements, nevertheless, if they are part of an effort by Railroads in combination or conspiracy to eliminate the competition of Aircoach, rather than used merely to meet the competition, the practices would be removed from the protection of section 5a(9). We do not think the Act or any agreement which has been approved under it can be construed as authorizing the use of such practices for the purpose of eliminating the competition of Aircoach
> . . . .

*Id.* at 887.

Confronted with this unequivocal interpretation of the statute, the defendants argue that *Aircoach* is not good law. They rely in large part on the Supreme Court's decision in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). These cases, however, should provide them no solace. At issue was the question whether the lobbying of the legislature and the executive (*Noerr*) or the attempt to influence public officials (*Pennington*) would be immunized from the antitrust laws by the First Amendment even when the actions were intended to eliminate competition. *Aircoach*, on the other hand, was concerned not with whether activity otherwise illegal under the Sherman Act is impliedly immunized by a constitutional provision but, rather, with whether such conduct is explicitly immunized by the Reed-Bulwinkle Act. In other words, the *Aircoach* Court was guided not by abstract constitutional principles but, rather, by the legislative history and statutory intent behind section 5a. Such an approach led the court to conclude that section 5a immunizes the collusive making of rates

---

321, 82 S.Ct. 1715, 10 L.Ed.2d 915 (1963) (national banking); *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (securities and commodities exchanges); *United States v. Radio Corporation* of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959) (broadcasting).

**10.** Pub.L.No. 662, 62 Stat. 472.

but does not immunize the collusive making of rates which are intended to eliminate competition. A long line of subsequent decisions is in agreement. *BBD Transportation Co. v. U.S. Steel Corp.*, 1976 Trade Cas. (CCH) ¶ 61,079 (N.D.Cal.1976); *United States v. Morgan Drive Away*, 1974–1 Trade Cas. (CCH) ¶ 74,888 (D.D.C.1974); *Marnell v. United Parcel Service, Inc.*, 260 F.Supp. 391 (N.D.Cal.1966); *Riss & Co. v. Ass'n of American Railroads*, 170 F.Supp. 354 (D.D.C.) *cert. denied sub nom., Atlantic Coastline Railroad Co. v. Riss & Co.*, 361 U.S. 804, 80 S.Ct. 108, 4 L.Ed.2d 57 (1959).[11]

Section 5a simply permits the railroads to organize a rate bureau for discussion of, and agreements to make, rates. In approving the formation of defendants' rate bureau in 1950, the ICC merely approved the procedures for those discussions and for reaching rate agreements. Nothing in the Reed-Bulwinkle Act authorizes the ICC to approve agreements which produce *particular* rates. As a result, the antitrust immunity provided by section 5a does not apply when particular rates are designed to inhibit or destroy competition. Because the defendants' rates were allegedly established for predatory and anti-competitive reasons, the defendants' agreements to set such rates are not immunized from antitrust prosecution.

The railroads also urge that even if their actions are not immune from prosecution, due process requires dismissal of the indictment because section 5a is ambiguous. They rely on the common law tradition that

"ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). However, even if the provision is unclear, this Circuit's decision in *Aircoach* should have resolved any ambiguities. Moreover, the defendants' argument is contrary to established precedent not only under section 5a but also under other statutes involving regulated industries.[12] Judge Flannery of this Court offhandedly rejected a similar contention in *Morgan Drive Away* by noting that "criminal prosecutions under the Sherman Act against defendants in regulated industries are not unknown." 1974–1 Trade Cas. (CCH) ¶ 74,888 at 95,999.

■ 2. *Referral of the immunity question to the ICC.* As an alternative to the prosecutorial argument, the defendants urge referral of this matter to the ICC, claiming that where an alleged antitrust violation is arguably immune from the antitrust laws under the provisions of a regulatory statute, the agency charged with implementation of the statute must be afforded an initial opportunity to determine whether the defendants' actions were consistent with the requirements of the statutory immunity. *See Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966); *Atlantic Coast Line Railroad v. Riss & Co.*, 267 F.2d 657 (D.C.Cir.1958).

There are several reasons why referral is not appropriate. The defendants' reliance upon civil case authority is misplaced.

11. The defendants also argue that the *Aircoach* Court was mistaken because it relied on *Georgia v. Pennsylvania R.R.*, 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), a case whose holding, they contend, Congress negated by passing the Reed-Bulwinkle Act in 1948. But Judge Fahy, who wrote the *Aircoach* opinion, was not quite so blundering as the defendants suggest. Rather, there is scant doubt that the *Georgia* decision is still good law. The case involved not merely collusive ratemaking but, also, rate discrimination in favor of northern ports and shippers and against the ports and shippers of Georgia. The defendants were also charged with coercion of those individual railroads which desired to set nondiscriminatory rates. The defendants argued that their acts were

immunized by a War Production Board certification to the Attorney General, pursuant to section 12 of the Small Business Mobilization Act, 50 App. U.S.C. § 1112, providing that rate bureaus were of sufficient importance to the prosecution of the war to warrant a temporary grant of relief from antitrust prosecution for joint ratemaking activities. In other words, the certificate provided during wartime the same immunity available since 1948 under the Reed-Bulwinkle Act. The Court rejected the argument that coercive and discriminatory activities were immunized by the certificate. 324 U.S. at 459 n.7, 65 S.Ct. at 727 n.7.

12. *See supra* p. 206 n.9.

There is no precedent for referring a criminal antitrust proceeding to the ICC so as to obtain an agency advisory opinion as to whether there has been an antitrust law violation. Prosecution of this case will not interfere with the ICC's regulation of the industry. *Cf., Carnation Co.*, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709. Nor would this Court be aided by the ICC's expertise in this area. *Cf., Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 302, 93 S.Ct. 573, 580, 34 L.Ed.2d 525 (1973). Section 5a grants no antitrust jurisdiction to the ICC. The antitrust relief provided in section 5a(9) is merely descriptive of the result following Commission approval of a section 5a agreement. The Commission is not granted the power to determine whether any agreement, or any act carried out pursuant to any agreement, does or does not constitute a violation of the antitrust laws.

Referral might be appropriate in this case if the ICC were empowered to approve the actions which prompted this indictment. *See Ricci*, 409 U.S. at 302, 93 S.Ct. at 580. However, as discussed above, the ICC has no authority to immunize predatory agreements. Whether or not there was, in fact, predation is a question which a judge and jury are clearly capable of answering.

Nevertheless, the defendants argue that referral is necessary because, under ¶ 22(b) of the indictment, the defendants lost their immunity not through predatory intent but by failing to follow certain procedures required under the 5a agreement. For instance, the government charges that the defendants failed to provide notice of rate proposals.[13] However, none of these procedural questions involves any technical or complex issues for which the ICC's expertise might be helpful, and thus referral is not necessary.

For the above stated reasons, the defendants' alternative motion to refer the immunity question to the ICC is denied.

### D.

*Joint Motion for a Pretrial Ruling on Whether a Per Se or Rule of Reason Standard Should be Applied in This Case.*

The above rulings guide the Court in a resolution of a final claim of the defendants—that the alleged offense is properly judged under a rule of reason, rather than a *per se*, antitrust standard. As the Supreme Court has aptly explained, agreements are *per se* violative of the antitrust laws when they are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). A rule of reason is applied, on the other hand, for those agreements "whose competitive effect can only be evaluated by analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Id.*

The government asserts that this is a plainly anticompetitive price-fixing case and, as such, the *per se* standard is appropriate, as it is in other price-fixing cases. *See, e.g., Catalano Inc. v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. The defendants contend, however, that the *per se* standard is reserved for clearly pernicious conduct,[14] and application of the doctrine here would ignore the peculiar legal status of ratemaking agreements within the railroad industry.

**13.** Six procedural requirements were allegedly disregarded by the defendants: (1) that rate proposals be in writing, (2) that public notice be given of rate proposals, (3) that the rate bureau chairman or his designee preside at meetings, (4) that interested parties be given an opportunity to speak at rate meetings, (5) that rate agreements be published, and (6) that each member of the rate bureau maintain the right of independent action.

**14.** *See Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) ("practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused").

Three characteristics of the railroad industry, according to the defendants, distinguish this case from other price-fixing cases. First, the defendants note that the railroad industry is heavily regulated, and the antitrust laws are applied differently to such industries. However, the presence of regulation, by itself, does not dictate the antitrust standard; antitrust actions involving regulated industries have been repeatedly tried under a *per se* standard.[15]

The defendants argue secondly that not only is this a heavily regulated industry, but it is also an industry in which Congress, in order to further economic efficiencies, has modified traditional competition policy through enactment of the Reed-Bulwinkle Act. As has been discussed in Part C above, however, the Reed-Bulwinkle Act does not modify the Sherman Act's prohibition against rates set for anticompetitive purposes. Indeed, the same argument was expressly rejected by the Court of Appeals in *Aircoach*, 253 F.2d at 886.

Nevertheless, the railroads argue that the appropriate precedent for this case is not *Aircoach* but, rather, *Silver v. New York Stock Exchange*, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389, which involved alleged antitrust violations in the securities industry. The question for the Court in *Silver* was to "reconcile pursuit of the antitrust aim of eliminating restraints of competition with the effective operation of a public policy contemplating that securities exchanges will engage in [anticompetitive] self-regulation . . . ." 373 U.S. at 349, 83 S.Ct. at

1252. After an extensive analysis of the nature of that self-regulation, the Court rejected the *per se* standard. It explained that "under the aegis of the rule of reason, traditional antitrust concepts are flexible enough to permit the Exchange sufficient breathing space within which to carry out the mandate of the Securities Exchange Act." *Id.* at 360, 83 S.Ct. at 1258.

The defendants are mistaken. The mandate of the Securities Exchange Act of 1934[16] differs fundamentally from the mandate of the Reed-Bulwinkle Act. The Exchange Act permitted the Stock Exchange to engage in a broad range of self-regulative actions, including establishment of barriers to membership, which were inherently anticompetitive. *Id.* at 349–57, 83 S.Ct. at 1252. The Reed-Bulwinkle Act, on the other hand, merely provides antitrust immunity for the discussion of, and agreement on, the setting of rates. The antitrust immunity extends, in other words, no further than the procedural agreement. Thus, no "breathing space" is required here.[17]

Finally, the defendants assert that a more lenient standard for their conduct is necessary because their actions were somehow in furtherance of the National Transportation Policy, as declared in the IC Act. The Policy promotes, *inter alia*, "the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive com-

**15.** *See, e.g., Isbrandtsen Co. v. United States*, 239 F.2d 933, 937–38 (D.C.Cir.1956), *aff'd sub nom., Federal Maritime Board v. Isbrandtsen*, 356 U.S. 481, 78 S.Ct. 851, 2 L.Ed.2d 926 (1958) (group boycott in ocean shipping industry subject to Federal Maritime Commission regulation); *Webb v. Utah Tour Brokers Ass'n*, 568 F.2d 670, 675–76 (10th Cir. 1977) (group boycott and ICC regulation); *United States v. Southern Motor Carriers Rate Conference*, 467 F.Supp. 471, 485–87 (N.D.Ga.1979) (state regulation of motor carrier rate bureau activity); *United States v. Pan Am*, No. 77–73 (D.D.C. April 26, 1977) (price-fixing and Civil Aeronautics Board regulation). *See also, United States v. National Broadcasting Ass'n*, No. 79–1549 (D.D.C. March 3, 1982).

**16.** 15 U.S.C. § 78a *et seq.* (1981).

**17.** *See* Part C, *supra*. The other cases relied upon by the defendants under the *Silver* rationale are similarly distinguishable. *See Broadcast Music v. Columbia Broadcasting System*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (applying the rule of reason in a price-fixing case where copyright laws had virtually encouraged the industry to engage in the challenged conduct); *United States v. Studiengesellschaft Kohle*, 670 F.2d 1122 (D.C.Cir.1981) (applying rule of reason where patent laws encouraged the challenged monopolistic conduct but recognizing that rule of reason applicability should not extend to naked horizontal restraints on trade).

petitive practices. . . ." [18] The Court is unconvinced that the acts alleged in the indictment, which according to the government were intended to eliminate or inhibit price competition from non-railroad-owned docks and from motor carriers, could in any way have promoted that policy.

 In sum, the indictment in this case charges a conspiracy to eliminate or inhibit horizontal competition from private docks and trucking companies because such competition could result in lower prices. Despite the possible delusion of security provided by the Reed-Bulwinkle Act, the defendants' actions—as *Aircoach* clearly holds—were never approvable by the ICC. As a result, the case is properly tried under the *per se* standard.

An appropriate Order accompanies this Memorandum Opinion.

### ORDER

In accordance with the accompanying Memorandum Opinion, it is this 15th day of April, 1982,

ORDERED that the following motions are denied:

1. Defendants' Joint Motion to Dismiss for Improper Venue, or, in the Alternative, to Transfer the Proceeding;

2. Motion of Defendant Bessemer and Lake Erie Railroad to Dismiss the Indictment for Duplicity and Misjoinder; or, in the Alternative, for Severance of Defendants and Separate Trials;

3. Joint Motion of Defendants Baltimore & Ohio Railroad Co., Chesapeake & Ohio Railway Co. and Norfolk and Western Railway Co. Joining the Motion of Defendant Bessemer & Lake Erie Railroad to Dismiss the Indictment on the Basis of Duplicity;

4. Motion of Defendant Norfolk and Western Railway Company to Sever its Trial from that of the Other Defendants;

5. Motion of Norfolk and Western to Transfer the Proceeding to the Western District of Virginia;

6. Defendants' Joint Motion to Dismiss or, in the Alternative, to Refer the Antitrust Immunity Issues in this Case to the Interstate Commerce Commission, and it is

FURTHER ORDERED that the alleged offense will be judged under a *per se* standard.

18. The Policy states in full:

It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulations of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each, to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices. . . .
54 Stat. 899 (1940).