See also, 538 F.Supp. 200.

**UNITED STATES of America**

v.

**BESSEMER AND LAKE ERIE RAIL-ROAD COMPANY, Appellant.**

No. 82–2065.

United States Court of Appeals, District of Columbia Circuit.

Argued 29 April 1983.

Decided 30 Aug. 1983.

**594**

Kenneth C. Anderson, Washington, D.C., with whom Timothy W. Bergin, Washington, D.C., was on the brief for appellant.

Marion L. Jetton, Attorney, Dept. of Justice, Washington, D.C., with whom John J. Powers, III, Washington, D.C., was on the brief for appellee.

Richard J. Flynn, Terence M. Hynes and Thomas H. Yancey, Washington, D.C., were on the brief for amicus curiae urging reversal.

Before TAMM and WILKEY, Circuit Judges, and McNICHOLS,* Senior District Judge, United States District Court for the District of Idaho.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

Most of the iron ore used in the "Steel Belt" of Pennsylvania, West Virginia, Ohio, and Kentucky comes from mines in the northwestern Great Lakes region and east-

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

ern Canada. This ore reaches its destination after a three stage journey: by rail carrier to the Great Lakes, across the Great Lakes by freighters, and by rail carriers to the mills. The appellant in this case is a rail carrier engaged in carrying ore from the freighters to the mills.

Along with other rail carriers, the appellant was charged under the Sherman Antitrust Act with conspiring to inhibit or eliminate competition. The alleged conspiracy involved concerted action by several railroads to forego competition among themselves, to eliminate or reduce competition from independent private docks, and to eliminate or reduce competition from motor carriers. The appellant was convicted pursuant to a plea of nolo contendere, but subsequently appealed.

This appeal raises three issues: (a) whether appellant's nolo contendere plea in the district court prevents this court from entertaining appellant's attack on the legal sufficiency of the indictment, (b) whether the doctrine of primary jurisdiction requires referral of this case to the Interstate Commerce Commission, and (c) whether section 5a of the Interstate Commerce Act immunizes appellant's conduct from prosecution under the antitrust laws.

## I. BACKGROUND

### A. *Legal Background*

For many years the Interstate Commerce Commission has regulated the rates set by rail carriers.[1] In the early days of ICC regulation, it was generally accepted that the agency's regulation supplemented, rather than supplanted, the antitrust laws.[2] Despite the potential for antitrust liability, railroads continued to act jointly in setting rates. The ICC condoned the practice.[3]

In the mid-1940's the tension between the ICC's policy of permitting joint action through rate bureaus and the policy expressed in the antitrust laws of forbidding cartels became more marked. In 1944 the Antitrust Division of the Justice Department sought to enjoin several western railroads from rate-setting practices which allegedly violated the Sherman Act.[4] In the same year the state of Georgia sought to charge 21 eastern railroads with "a conspiracy in the restraint of trade" which unfairly increased freight rates to and through Georgia. The Supreme Court, in *Georgia v. Pennsylvania R.R. Co.*,[5] permitted the latter suit, holding that "regulated industries are not per se exempt from the Sherman Act."[6] Acknowledging that the state could not bring suit to change the ICC-approved rates directly, the Court nonetheless held that the conspiracy to fix rates illegally was amenable to antitrust prosecution.

Congress responded in 1948 by passing the Reed-Bulwinkle Act,[7] section 5a of the Interstate Commerce Act.[8] The Act authorized the creation of rate bureaus to set agreements on "rates, fares, classifications,

---

1. 49 U.S.C. § 15(1) (1976); *Iron Ore Rate Cases,* 41 I.C.C. 181 (1916), 44 I.C.C. 368 (1917).

2. *See United States v. Trans-Missouri Freight Ass'n,* 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); *see generally* C. FULDA, COMPETITION IN THE REGULATED INDUSTRIES: TRANSPORTATION 283 (1961).

3. *See In re Trans-Continental Freight Bureau,* 77 I.C.C. 252 (1923) (approving clearinghouse for information relating to tariffs); *see generally* Dickinson, *Rate Conferences in the Railroad Industry Under the Sherman Act and the Act to Regulate Commerce,* 12 LAW & CONTEMP.PROB. 470 (1947).

4. *United States v. Assoc. of American Railroads,* 4 F.R.D. 510 (D.Neb.1945) (rejecting defendant's motion to dismiss complaint).

5. 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945).

6. *Id.* at 456–57.

7. PUB.L. No. 662, 62 Stat. 472 (1948).

8. 49 U.S.C. § 5b (1976). Since the events included in this case occurred, the Reed-Bulwinkle Act has been substantially amended by the Railroad Revitalization and Regulatory Reform Act of 1976, PUB.L. No. 94–210, 90 Stat. 31 (2d Sess. 1976) and recodified by PUB.L. No. 95–473, 92 Stat. 1466 (2d Sess. 1978). The current version is codified at 49 U.S.C. § 10706 (Supp. V 1981).

divisions, allowances, or charges."[9] It granted relief "from the operation of the antitrust laws with respect to the making of such agreement, and with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission."[10]

## B. *Factual Background*

The appellant in this case joined a rate bureau formed soon after the passage of the Reed-Bulwinkle Act. The original agreement won ICC approval in 1950.[11] No claim has been made that the original agreement, by its terms, fails to satisfy the requirements of section 5a.[12]

The anticompetitive activity prosecuted here arises not from the formation of the rate bureau, but from the response of the members of the rate bureau to a technological innovation in carrying iron ore across the Great Lakes. At the time the rate bureau was formed, ships known as "bulkers" transported virtually all iron ore to Lake Erie docks in an unprocessed, mud-like form.[13] The bulkers were unloaded by heavy cranes, the most common of which were called "huletts." A hulett unloads ore from the hold of a ship using a clamshell-like claw that dips into the ship, grabs a load of iron ore, and carries it to the dock. The ore may either be loaded directly into waiting rail cars or moved to storage.[14]

The railroads owned the unloading facilities and docks used to service the huletts.[15] In addition to publishing charges for transporting the ore, the railroads published a series of charges for unloading the ore from the freighters. The structure of these rates reflected an expectation that huletts would be used to unload the bulkers.[16]

In the early 1950's a new technology developed for "pelletizing" the ore into high-grade pellets the size of marbles.[17] This new technology made it possible to ship the ore in vessels called "self-unloaders," which can discharge their cargo through use of a conveyor belt system that is built into the vessel.[18] Since the self-unloaders can lift the ore to deck level and drop it onto the dock, they eliminated the need for huletts or similar dock unloading equipment.[19]

The new pelletization technology threatened to render obsolete the substantial investment the railroads had made in huletts and other unloading facilities. In addition, the new technology created the prospect that private docks not equipped with huletts—which had been unable to compete for the business of unloading bulkers—could now compete for the business of self-unloaders. The entry of private docks into the business would break the railroads' control over the shipment of iron ore from the freighters to the steel mills.

Those railroads charged in the indictment responded to the new technology by reaching a new, separate agreement "as early as" 1956.[20] The goals of the new agreement were three-fold:

(a) to inhibit or eliminate competition from private docks in the handling of iron ore on Lake Erie;

---

9. 49 U.S.C. § 5b(2) (1976) (current version at 49 U.S.C. § 10706 (Supp. V 1981)).

10. 49 U.S.C. § 5b(9) (1976) (current version at 49 U.S.C. § 10706 (Supp. V 1981)).

11. *Eastern Railroads—Agreements,* 277 I.C.C. 279 (1950).

12. The discussions of the rate agreement in the indictment suggest only that its terms were not complied with. *See* Indictment, ¶ 16 (describing the existence of the rate agreement); ¶ 17 (listing certain provisions of the agreement); and ¶ 23(g) (charging violation of procedures required by the agreement).

13. Indictment at ¶ 9; Joint Appendix (JA) at 48.

14. *Id.*

15. *Id.* at ¶ 19, JA at 51.

16. *Id.* at ¶ 10; JA at 48.

17. *Id.* at ¶ 11; JA at 48.

18. *Id.* at ¶ 12; JA at 49.

19. *Id.*

20. *Id.* at ¶ 21; JA at 51.

(b) to inhibit or eliminate competition among themselves in the transshipment of iron ore without seeking or obtaining ICC approval in accordance with the 5a Agreement procedures; and

(c) to inhibit or eliminate competition from motor carriers in the transportation of iron ore from docks on Lake Erie to steel mills.[21]

Over the ensuing years, the members of the conspiracy took a series of actions to implement their agreement.[22] Some of these actions took place within the structure of the pre-existing rate bureau; others took place outside it.[23] The indictment lists nine categories of acts taken in furtherance of the conspiracy:

(a) removing private docks from line haul tariffs filed with the ICC in Washington, D.C. so as to prevent such docks from handling iron ore from self-unloaders;

(b) amending line haul tariffs filed with the ICC in Washington, D.C. to provide that commodity line haul rates would apply only from railroad-owned docks;

(c) refusing to grant commodity line haul rates for rail movements of iron ore from private docks to steel mills;

(d) quoting the same charges for handling iron ore from self-unloaders as from bulkers even though services identified in the applicable tariffs were not to be performed;

(e) foregoing the right of independent action with respect to handling charges for iron ore from self-unloaders;

(f) refusing to lease railroad dock space to Litton Industries for the handling of iron ore from self-unloaders;

(g) without seeking or obtaining ICC approval in accordance with the 5a Agreement procedure, refraining from independently or collectively reducing line haul rates for rail movements of iron ore in order to meet truck competition;

(h) seeking to eliminate the trucking of iron ore from Pinney Dock, a private dock on Lake Erie; and

(i) seeking to prevent the trucking of iron ore from a railroad controlled dock at Lorain, Ohio by establishing an arbitrary usage charge applicable only to the transportation of iron ore by truck.[24]

In 1981 the government brought an indictment charging that the 1956 agreement of the railroads to eliminate the competition created by self-unloaders violated the Sherman Antitrust Act.[25] The appellant, along with the other defendants, filed a series of motions seeking to dismiss the indictment.[26] After the district court rejected the preliminary motions,[27] the appellant entered a plea of nolo contendere. Judgment was entered, and the appellant was sentenced.[28] This appeal followed.

## II. ANALYSIS

### A. *Appeal from Plea of Nolo Contendere*

▆▆▆▆ The appeal in this case follows a plea of nolo contendere by the appellant. For the purposes of this appeal, the plea of nolo contendere has the effect of a guilty plea.[29] The plea admits to every essential element of the offense that is well pleaded in the indictment.[30] Convictions pursuant to a nolo plea cannot be attacked on the merits, and can only be challenged by showing defects that affect the court's subject

---

21. *Id.* ¶ 22; JA at 52.

22. *Id.* at ¶ 23; JA at 52–53.

23. *Id.; see* TAN 53–65.

24. *Id.*

25. 15 U.S.C. § 1 et seq. (1976).

26. The procedural history of the case is given at JA 1–4.

27. *United States v. Baltimore and Ohio Railroad Co.,* 538 F.Supp. 200 (D.D.C.1982).

28. JA 4.

29. *United States v. Norris,* 281 U.S. 619, 622–23, 50 S.Ct. 424, 425, 74 L.Ed. 1076 (1930).

30. *United States v. Frankfort Distilleries, Inc.,* 324 U.S. 293, 296, 65 S.Ct. 661, 663, 89 L.Ed. 951 (1945).

matter jurisdiction, or by showing that the indictment "fails to charge an offense." [31]

■ The government argues that the appellant's nolo plea bars consideration of this appeal.[32] The government urges, somewhat formulistically, that the appellant's theory may not be considered because it raises a "defense" rather than identifies a flaw in the original indictment.

It is true, as the government asserts, that in many cases courts have refused to consider "defenses" raised after the entry of a nolo plea. These cases, however, do not address defenses which go to the issue of whether the indictment itself alleges a criminal violation, but instead generally refer to one of three situations. First, some courts have refused to entertain appeals from a guilty or nolo plea which would require either the government or the appellant to offer additional facts for proof. This rule prevents the defendant from presenting additional factual arguments which are inconsistent with the indictment.[33] Another line of cases bars the assertion of procedural defenses—defenses which assert a flaw in the procedure leading up to indictment—after a guilty or nolo plea has been accepted. In these cases, the admission of substantive guilt renders irrelevant the putative procedural errors.[34] Finally, a third line of cases forecloses—with a few aberrations not relevant here—an attack on a guilty or nolo plea that is based on subsequent changes of law.[35]

All three lines of cases draw on a single unifying principle—the entry of a nolo plea bars any subsequent defense or argument that looks outside the indictment. No "defense" may be raised which draws on additional facts, procedural defects or changes in substantive law. However, the entry of a nolo plea does not prevent raising a "defense" which requires no reference beyond the "four corners" of the indictment. A party convicted subsequent to a nolo plea may still argue that the facts in the indictment simply do not add up to a criminal offense.

■ The "defense" asserted by the appellant represents the sort of challenge which can be raised even after the entry of a nolo plea. The appellant argues, in essence, that the substantive law governing its case is provided not by the Sherman Antitrust Act alone, but by the Sherman Antitrust Act taken together with section 5a of the Interstate Commerce Act. Under the law stated by these two acts, it urges, the indictment fails to charge an offense.

It does not advance the inquiry to split hairs over whether the absence of section 5a immunity is a predicate for invoking the Sherman Act, or whether the presence of section 5a immunity must be raised as an affirmative defense. In either case, facts sufficient to raise the claim are contained within the indictment itself; in either case, the burden of criminal persuasion remains on the government.[36]

While the nolo plea does not bar our review of the appellant's claims, it does define our review. We must assume the truth of every factual allegation in the indictment. We may not consider any argument by the appellant which would rely on facts not within the four corners of the indictment, nor may we accept any interpretation of the indictment which would require the government to respond with additional explanatory facts. We may only consider whether the indictment, as it stands, states an offense.

---

**31.** *Coleman v. Burnett,* 477 F.2d 1187, 1194 n. 20 (D.C.Cir.1973).

**32.** Brief for the United States of America at 21–28.

**33.** *See, e.g., United States v. Fitzgerald,* 466 F.2d 377, 379 (D.C.Cir.1972).

**34.** *See, e.g., Tollett v. Henderson,* 411 U.S. 258, 261, 93 S.Ct. 1602, 1605, 36 L.Ed.2d 235 (1973) (defects in grand jury procedure).

**35.** *See, e.g., Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

**36.** *See* C. WRIGHT, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 2d § 403 (1982).

## B. *Primary Jurisdiction*

Appellant suggests,[37] and amicus urges at length,[38] that the judgment should be vacated and the case remanded to the ICC under the doctrine of primary jurisdiction. The amicus urges this so that the ICC can examine the issues of intent, compliance with 5a procedures, and the scope of 5a immunity.[39]

 Put simply, the time for urging the doctrine of primary jurisdiction has passed in this case. As we have discussed, the entry of the nolo plea bars all issues but those involving subject matter jurisdiction and the legal sufficiency of the indictment.[40] Primary jurisdiction is not such an issue. The doctrine of primary jurisdiction, despite what the term may imply, does not speak to the jurisdictional power of the federal courts.[41] It simply structures the proceedings as a matter of judicial discretion, so as to engender an "orderly and sensible coordination of the work of agencies and courts."[42] We may not now second guess whether the trial judge used his discretion wisely.[43]

## C. *Immunity*

 The appellant—admitting the truth of the factual allegations of the indictment—seeks refuge in the immunity granted by section 5a.[44] Its actions were not illegal, appellant argues, because they were all taken in conformity with a section 5a rate agreement. The immunity granted by section 5a cannot be voided, appellant contends, simply because some immunized actions might have been motivated by an anticompetitive intent.[45]

In assessing appellant's argument, it is important first to stress the limited nature of section 5a immunity. The language of the statute flatly declares that the haven of section 5a is not all-encompassing; to the contrary, it is specifically limited to those actions taken "in conformity with"[46] the terms of the agreement and the prescriptions of the ICC.

The legislative history underscores the limits on section 5a's protection. At the time the Act was passed, at least two major actions were pending against rate bureaus for alleged violations of the antitrust

37. Brief for Appellant at 38–39 n. 41.

38. Brief of the Association of American Railroads as Amicus Curiae [hereinafter Amicus Brief] at 40–51.

39. Amicus Brief at 51.

40. *See* TAN 29–36.

41. *United States v. Western Pacific Railroad Co.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956) (doctrine requires exercise of discretion); *Federal Maritime Board v. Isbrandtsen Co.,* 356 U.S. 481, 498–99, 78 S.Ct. 851, 861–62, 2 L.Ed.2d 926 (1958) (primary jurisdiction only determines whether court or agency will initially decide an issue); *United States v. Philadelphia National Bank,* 374 U.S. 321, 353, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915 (1963) (court's jurisdiction is not ousted, but postponed); *Atlantic Coast Line Railroad Co. v. Riss & Co.,* 267 F.2d 659, 660 (D.C.Cir.), *cert. denied,* 361 U.S. 804, 80 S.Ct. 108, 4 L.Ed.2d 57 (1959) (primary jurisdiction determination requires "exercise of discretion" of court).

42. *Cheyney State College Faculty v. Hufstedler,* 703 F.2d 732, 736 (3d Cir.1983), *quoting* 3 K.

DAVIS, ADMINISTRATIVE LAW TREATISE § 19.01 (1958).

43. The amicus points to *Atlantic Coast Line Railroad v. Riss & Co.,* 267 F.2d 657 (D.C.Cir. 1958), which requires referral to the agency where the "intent and effect" of a rate reduction is the "sole or dominant issue," but which does not require referral where the rate reduction is "only one of considerable number of overt acts alleged and where the policy favoring referral is clearly outweighed by other factors such as the probability of undue delay." *Id.* at 658.

Because of the nolo plea, *Riss* is not controlling at this stage of the litigation. In any event, in the case before us the "intent and effect" of the rate filings is only one issue among several. The entry of the nolo plea also resolved all factual issues bearing on the "intent and effect" of the rate reductions, so that referral to the agency at this time could only lead to pointless delay.

44. Brief for Appellant at 35–65.

45. *Id.*

46. 49 U.S.C. § 5b(9) (1976) (current version at 49 U.S.C. § 10706 (Supp. V 1981)).

laws.[47] Both sponsors explicitly stated that the actions would not be affected by passage of the Act because the illegal activities alleged in the suits would not fall within the newly created immunity.[48] The House Report more precisely stated the reach of the privilege:

> The bill leaves the antitrust laws to apply with full force and effect to carriers, so far as they are now applicable, except as to such joint agreements or arrangements between them as may have been submitted to the [ICC] and approved by that body . . . .[49]

This Circuit has had earlier occasion to pass upon the scope of the 5a privilege. In *Atchison, Topeka and Santa Fe Railway Co. v. Aircoach Transport Ass'n*,[50] the court reviewed a claim by a group of railroads that their practice of submitting joint bids for military transport business was immunized by section 5a, even though a desire to eliminate competition from airlines allegedly underlay the joint bid system. The court rejected the railroad's claim:

> Even though it should be found in the end that the practices as such have been validly immunized by section 5a approved agreements, nevertheless, if they are part of an effort by Railroads in combination or conspiracy to eliminate the competition of Aircoach, rather than used merely to meet that competition, the practices would be removed from the protection of section 5a(9). We do not think the Act or any agreement which has been approved under it can be construed as authorizing the use of such practices for the purpose

of eliminating the competition of Aircoach for the section 22 transportation involved.[51]

The appellant argues that *Aircoach* does not apply to this case. The crux of the appellant's argument is that *Aircoach* spoke only to a situation where the rates involved were not subject to ICC remedial jurisdiction.[52] Even if we were to adopt appellant's limiting reading of *Aircoach*, the appellant's argument would not succeed on the facts of this case. The offense charged in this case is not subject to ICC remedial jurisdiction. The government does not seek to amend the 5a rate agreement or to alter prospectively the rates set by the 5a rate bureau; it seeks to punish an illegal antitrust combination which happened to employ a rate bureau. The ICC is not equipped to "remedy" criminal violations of the antitrust laws.

The statutory language, the legislative history, and the case law all point to the same conclusion: the section 5a immunity reaches only those actions actually taken "in conformity with" the rate agreement and the terms and conditions laid down by the ICC. It does not sweep within it a larger conspiracy which utilizes a section 5a rate bureau as a means to an end; it does not legitimize illegal schemes which happen to coincide at points with the legitimate actions of a rate bureau.

■ The activities described in the indictment do. not fit within the narrow 5a privilege. First, the indictment does not attack the rate bureau itself. It alleges, instead,

---

**47.** *See* TAN 4–6.

**48.** 94 Cong.Rec. 6643 (1948) (Sen. Reed—The bill need not expressly exclude agreements that are "unjustly discriminatory as between shippers or geographic regions or areas" because that "is the law now."); *id.* at 8415 (Sen. Reed —"[T]here is nothing in the bill that would affect the validity of the Georgia suit in the Supreme Court, and there is nothing in the bill that would affect the antitrust proceedings pending in the court at Lincoln, Nebr."); *id.* at A4034 (Rep. Bulwinkle—The bill "does not render moot or defeat the Georgia or Lincoln antitrust suits if the plaintiffs are able to prove the charges alleged. . . . The issue in the Georgia

case is not whether mere participation in the rate conferences by the railroads violates the antitrust laws but whether the railroads have used the rate conferences to fix rates by coercion and to discriminate against Georgia.").

**49.** H.R.Rep. No. 1100, 80th Cong., 1st Sess. 5 (1947).

**50.** 253 F.2d 877 (D.C.Cir.1958), *cert. denied,* 361 U.S. 930, 80 S.Ct. 372, 4 L.Ed.2d 354 (1960).

**51.** *Id.* at 887.

**52.** Reply Brief for Appellant at 27.

that some members of the rate bureau entered into a separate agreement.[53] This agreement only incidentally touched upon the setting of rates; its real purpose was to ward off the outside competition heralded by the advent of the self-unloaders.[54]

More than mere purpose or "intent" distinguished this separate conspiracy from the rate bureau. Several of the actions taken by this separate conspiracy were not "in conformity with" the rate bureau's 5a rate agreement.

Some of the actions were procedurally inconsistent with section 5a. Paragraph 23(d) of the indictment alleges that defendants "quot[ed] the same charges for handling iron ore from self-unloaders as from bulkers even though services identified in the applicable tariffs were not to be performed." [55] The crux of this charge is that handling the self-unloaders represented a significantly different type of service.[56] Rather than promulgating a new rate for this new service in accordance with ICC requirements, the conspirators shielded the new joint rate from ICC scrutiny.

The defendant responds that the indictment does not allege any failure to adhere to section 5a procedures.[57] It is true that the indictment merely describes the actions which violated section 5a procedures without explaining how they were procedurally deficient. This failure to provide reasons why the acts described were procedurally deficient does not seem to be a ground for holding the indictment invalid, especially since the facts clearly indicate a violation of the appropriate procedures.

Other acts alleged in the indictment are inconsistent with the substantive [58] requirements of section 5a. At paragraph 28(f) the indictment alleges that defendants refused "to lease railroad dock space to Litton Industries for the handling of iron ore from self-unloaders." [59] Such an agreement purports to regulate a subject matter—services available to customers—not within the scope of a section 5a agreement.[60]

The appellant contends that the refusal to lease dock space was merely "ancillary" to the rate structure.[61] The appellant argues that leasing dock space would have led to reduced handling charges, and, insofar as handling charges fall within the section 5a agreement, decisions as to whether to lease dock space must therefore "fall within" the scope of the agreement also. The problem with the appellant's argument is that it proves too much: any service that is, or might conceivably be, provided by carriers is in some way "ancillary" to the rates charged. Under appellant's argument, then, any joint decision to freeze the level of services or to forego development of modern services would be an agreement as to "rates." This would read out of existence the statutory requirement [62] that joint agreements be limited to rates.

Still other acts alleged in the indictment had nothing at all to do with making or carrying out a section 5a rate agreement. In section 23(h) the indictment alleges that

**53.** Indictment at ¶ 22; JA at 50.

**54.** *Id.* (describing the specific goals of the conspiracy).

**55.** *Id.* at ¶ 23(d).

**56.** Brief for United States of America at 42.

**57.** Reply Brief for Appellant at 29.

**58.** The government also argues that "[t]he indictment alleged that the defendants, in furtherance of the conspiracy, *gave up* 'the right of independent action with respect to handling charges for iron ore for self-unloaders.'" Brief for the United States of America at 40 (emphasis added). The language in the indictment is somewhat less forceful than the government's

brief claims. The indictment only accuses the conspirators of "*foregoing* the right of independent action." JA at 53 (emphasis added). This language suggests that the conspirators merely failed to exercise their right of independent action—a failure which by itself does not violate section 5a.

**59.** Indictment at ¶ 23(f).

**60.** 49 U.S.C. § 5b(2) (1976) (current version at 49 U.S.C. § 10706 (Supp. V 1981)).

**61.** Reply Brief for Appellant at 32 n. 41; Brief for Appellant 23 n. 29, 65–66 n. 75.

**62.** 49 U.S.C. § 5b(2) (1976) (current version at 49 U.S.C. § 10706 (Supp. V 1981)).

the conspirators sought to eliminate the trucking of iron ore from a private dock.[63] Seeking to terminate competition which has been carried out wholly without recourse to services offered by the railroads cannot be reconciled with the right to set rates jointly.

The appellant responds that the bill of particulars reveals that the scheme to terminate the competitive trucking service in fact turned on ratemaking—a member of the conspiracy offered to haul iron ore from the private dock at a lower rate if the truckers were denied access.[64] Even if we were inclined to look outside the four corners of the indictment, we fail to see how these facts would help appellant's case. The immunity granted by 5a does not extend to bald attempts to use the rate-setting process to blackball competitors.[65]

The facts admitted by the appellant clearly show that the actions of the conspirators exceeded the bounds of what could be done "in conformity with" a 5a rate agreement. The ICC did not and legally could not have condoned the acts taken by the conspirators. The statutory language, the legislative history, and the subsequent case law all agree that the immunity cannot extend beyond just those acts taken in conformity with the rate agreement. The conclusion, then, must be that appellant cannot rely on the immunity granted by section 5a. Having failed to fit its actions within the zone protected by the Act the appellant must do without its protection.

### III. CONCLUSION

For the reasons stated, the judgment of the district court is

*Affirmed.*

**63.** Indictment at ¶ 23(h).

**64.** Brief for Appellant at 23 n. 29.

**65.** The actions of the appellant's co-conspirator in this case are clearly distinguishable from those cases cited by appellant where railroads are permitted to set rates for one service (such as hauling commodities) which disadvantage competitors for another service (such as providing dock services). *See Wharfage Charges at Atlantic and Gulf Ports,* 157 I.C.C. 663 (1929). They also are, for similar reasons, dis-

tinguishable from rate setting which would have disadvantaged the competing truck lines directly by providing the equivalent service at a lower rate.

Here the disadvantage to the truck lines would have come indirectly, through a collusive agreement with the private docks to deny access to the truck lines. Rates would have played a role in the collusive agreement only to the extent they were employed to enforce the dock's adherence to the collusion.