**ARMCO STEEL COMPANY,
L.P., Plaintiff,**

v.

**CSX CORPORATION, et al., Defendants.**

**Civ. A. No. 90–1493.**

United States District Court,
District of Columbia.

Sept. 6, 1991.

312

Richard T. Colman, Marcia Press Kaplan, Robert F. Ruyak, Howrey & Simon, Washington, D.C., for plaintiff.

Richard McMillan, Jr., Donald L. Flexner, William Randolph Smith, Crowell & Moring, Guy Paul Moates, Sidley & Austin, Charles Bruce Wayne, Schwalb, Donnenfeld, Bray & Silbert, P.C., James Vernon Dick, Squire, Sanders & Dempsey, Robert M. Jenkins, III, Paul A. Cunningham, Pepper, Hamilton & Scheetz, Washington, D.C., for defendants.

## MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

Now before the Court are three motions filed by the defendants in this antitrust suit in which the plaintiff, Armco Steel Company ("Armco"), alleges that the defendant railroad companies conspired to artificially inflate the cost of transporting and handling iron ore in the Great Lakes region. Before the Court are the following mo-

tions: Defendant Consolidated Rail Corporation's ("Conrail") Motion to Stay Proceedings Pending Arbitration; Defendants CSX Corp., CSX Transport., Inc. ("CSX") and Toledo Ore Railroad Company's ("TORCO") Motion to Dismiss, and Defendant Bessemer and Lake Erie RR Co.'s ("Bessemer") Motion to Dismiss, or in the Alternative, to Transfer to the Northern District of Ohio. For the reasons stated below, the Court shall deny Conrail's Motion to Stay Proceedings Pending Arbitration, deny CSX and TORCO's Motion to Dismiss, and grant Bessemer's Motion to Transfer to the Northern District of Ohio.

## Statement of the Case

The plaintiff, Armco, a limited partnership, has filed this five-count complaint alleging, generally, that the defendants and various non-defendant co-conspirators conspired to artificially inflate the cost of transporting and handling iron ore in the Great Lakes region.

Armco is engaged in the manufacture, distribution and sale of steel and steel products throughout the world. It obtains most of its iron ore from mines in Minnesota and Michigan. The ore is generally shipped from upper Great Lakes ports by vessel to docks in Ohio on Lake Erie owned by the defendants or the non-defendant co-conspirators (hereinafter, "defendants"). After the ore arrives in these Ohio ports, approximately 50% of the ore is transported inland by rail lines also owned by the defendants to Armco's Ohio steel mills. The other 50% is transported inland by defendants' rail lines to plaintiff's Kentucky steel mill.

Before the mid-1950's, iron ore was shipped in its natural, rough-mined form on vessels known as "bulker" vessels that had to be unloaded by heavy cranes ("huletts") at the docks. Defendants invested heavily in the type of equipment needed to unload the bulker vessels.

Starting in the mid-1950's, iron ore producers began to "pelletize" ore which could be more easily shipped in self-unloading vessels. These vessels unload themselves through the use of conveyer belts built into the vessels. These conveyer belts eliminate the need for the huletts and other unloading equipment at the docks. In addition to eliminating the need for the heavy dock equipment, the self-unloading vessels unloaded iron ore faster and could transport larger quantities of ore at a lower cost. Furthermore, non-railroad docks, unencumbered by huletts, were ideally suited for receiving from the self-unloading vessels. Therefore, non-railroad docks on the Great Lakes began to provide iron ore handling and storage capabilities for the self-unloading vessels, in direct competition with the defendants.

Armco's complaint alleges that the technological advancement of the self-unloader and the competition of the non-railroad docks threatened the defendants' monopoly and the defendants sought to thwart the use of these self-unloading vessels and to insure the continuation of their monopoly by engaging in an unlawful conspiracy which took several forms.

Armco alleges that the defendants entered into various agreements and took various actions in furtherance of this conspiracy, including the following:

(1) charging the same price for unloading ore from bulker vessels as from self-unloading vessels despite the difference in services performed for the two types of vessels;

(2) refusing to publish dock handling rates for self-unloaders;

(3) agreeing to deny commodity line haul rates to non-railroad docks;

(4) agreeing to charge Armco for handling services never rendered;

(5) agreeing to charge unreasonably high rates for handling services and inland transportation of the ore;

(6) agreeing to require the plaintiff to enter into an exclusive handling and transportation arrangement at the Toledo dock;

(7) agreeing not to break the published rates for transshipping;

(8) agreeing to refuse self-unloading vessels from discharging at railroad owned docks;

(9) agreeing to prevent and delay use of truck transportation from non-railroad docks;

(10) agreeing to refuse volume rates;

(11) agreeing to prevent acquisition of docks that could accommodate self-unloading vessels or would permit truck access;

(12) agreeing to charge unlawfully-agreed-upon rates for dock handling and transportation;

(13) setting rates at "informal" meetings before the official meetings of the rate bureau.

Armco contends that each of these actions thwarted the development of the self-unloaders—a technological development which would have made it cheaper for Armco to ship its ore. Armco contends in its complaint that its handling and transportation costs still are artificially high because of the actions taken in furtherance of the defendants' conspiracy.

Count I of the Complaint alleges that the defendants engaged in a conspiracy to restrain trade in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3. Count II of the Complaint alleges that the defendants conspired to monopolize the dock-handling and ore transportation business in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Count III alleges that the Toledo contract is an unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act. Count IV alleges that defendants CSXT, CSX and TORCO monopolized interstate trade and commerce in the business of services for iron ore in Toledo, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Count V alleges a violation of Ohio's antitrust statute, the Valentine Act, Chapter 1331, Ohio Revised Code.

This alleged conspiracy (which the defendants allege ended at least 12 years ago) has already triggered two major lawsuits in 1980 which, thereafter, triggered eleven additional lawsuits multi-districted in the United States District Court for the Eastern District of Pennsylvania.

*Discussion*

(1) *Defendant Consolidated Rail Corporation's Motion to Stay Proceedings Pending Arbitration and Defendants CSX and TORCO's Motion to Dismiss*

Defendant Conrail's Motion to Stay Proceeding Pending Arbitration and Defendants CSX and TORCO's Motion to Dismiss concern an arbitration provision in a contract with TORCO ("TORCO contract") which Armco now alleges in its complaint to be an illegal contract and a product of an illegal antitrust conspiracy. Armco's complaint alleges that defendants Conrail, CSX, and TORCO forced Armco to enter into "an exclusive and economically disadvantageous long-term requirements contract for the handling and storage of its iron ore at Toledo" in violation of Sections 1 and 2 of the Sherman Act.

Sections 8 and 9 of the TORCO contract contains the following arbitration provisions:

8. *Forum.* The exclusive remedy for the resolution of all claims, disputes, and other matters in question arising under or relating to this Agreement, shall be negotiation and arbitration in accordance with 9 hereof; and the parties hereby waive any contention or defense they may have that such claims, disputes or other matters in question are subject to the jurisdiction of the ICC or the PUCO.

9. *Arbitration.* Should any dispute arise between the parties hereto concerning the rights and obligations of either of them hereunder, the parties agree that same shall be submitted to arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The decision of the arbitrator so appointed by said Association shall be final and binding upon the parties hereto. Each party to the arbitration shall pay compensation, costs, fees, and expenses of its own witnesses, exhibits, and counsel. The compensation, costs, and expenses of the arbitrator shall be borne equally by the parties hereto.

Defendant Conrail was not a party to this contract. However, Conrail argues that although it is not a party to the con-

tract, because Armco's antitrust claims against CSX and TORCO are "inextricably intertwined" with the claims against Conrail, and Armco's antitrust claims "relate to" the TORCO contract, this Court should exercise its discretion to stay the proceedings in this Court between Conrail and Armco pending conclusion of the mandatory arbitration.

Any arbitration which may be demanded by Armco or TORCO pursuant to the Toledo contract will be governed by the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* Section 3 of the Act provides that if a party to an arbitration agreement seeks to avoid arbitration by filing suit in a federal court, "the court in which the suit is pending, upon being satisfied that the issue involved in such suit is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement...." 9 U.S.C. § 3.

Section 3 of the Federal Arbitration Act does not ordinarily empower this Court to stay Armco's claims against Conrail, a non-party to the TORCO contract. *See Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co.*, 761 F.2d 198, 203 (5th Cir.1985) (Section 3 "cannot be the source of the district court's authority to stay a claim between ... parties" not subject to an arbitration agreement); *Hikers Indus. v. William Stuart Indus. (Far East), Ltd.*, 640 F.Supp. 175, 177 (S.D.N.Y.1986) (stay of action vis-a-vis party not subject to arbitration agreement cannot be sustained under 9 U.S.C. § 3).

■ Despite the fact that Section 3 refers to a party to the arbitration agreement seeking arbitration, Section 3, in conjunction with considerations of judicial economy, also allows a non-party to the agreement to seek a stay as long as that lawsuit is based on issues referable to arbitration under an arbitration agreement governed by the Arbitration Act. *See Contracting Northwest, Inc. v. City of Fredericksburg,*

*Iowa*, 713 F.2d 382, 387 (8th Cir.1983). Therefore, Conrail may seek a stay of the action in this Court if the arbitration of the TORCO contract concerned common questions of fact.

With this standard in mind, it is clear that Conrail has failed to prove that resolution of the dispute surrounding the TORCO contract will resolve all of the allegations in Armco's complaint. Conrail looks to only four paragraphs of the thirty-page complaint and attempts to undermine all other allegations in the complaint.

Conrail contends that the TORCO contract is the only issue which provides a basis for federal subject matter jurisdiction. That is, the contract is the only distinct action in furtherance of the conspiracy which has taken place in the past ten years. Although discovery may reveal this to be true, this is not a matter properly before the Court on a motion to dismiss. Armco's allegations must be taken as true for the purpose of this motion. In its complaint, Armco alleges *continuing* violations of the Sherman Act—therefore eliminating the statute of limitations concerns raised by Conrail.

Although it may be that Armco will be unable to prove any conspiratorial actions taken by the defendants within the applicable statute of limitations, it is not for the Court to disregard Armco's allegations of a continuing conspiracy. If, after discovery, the defendants believe summary judgment is appropriate, the Court will take the matter up at that time.

Further, Conrail has failed to rebut the presumption that "the arbitration and the lawsuit will each proceed in its normal course." *Pensacola Constr. v. St. Paul Fire & Marine Ins. Co.*, 705 F.Supp. 306, 308 (W.D.La.1988).[1] The pendency of the TORCO dispute will not hamper Conrail's or any of the other defendants' efforts to defend themselves in this matter. Conrail has defended against the same allegations

---

1. Even if the claims *did* overlap, Conrail's judicial economy argument is not completely compelling. The Court may deny a request for a stay "even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Terra Resources v. Burgin*, 664 F.Supp. 82, 90 (S.D.N.Y.1987), *quoting, Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217, 105 S.Ct. 1238, 1240, 84 L.Ed.2d 158 (1985).

in a criminal proceeding and in at least twelve prior civil cases. Any claim of inability to defend is clearly absurd.

The Court, therefore, shall deny Conrail's Motion to Stay Proceedings Pending Arbitration. Despite Conrail's claims to the contrary, most of Armco's claims against the defendants are separate and distinct from the TORCO contract.

### (2) *Motion to Dismiss by Defendants CSX Corp., CSX Transp., Inc., and Toledo Ore Railroad Company*

The Motion to Dismiss filed by CSX and TORCO raises issues similar to those raised by Conrail in its motion to stay. However, in their motion, these defendants contend that since the TORCO contract is the only basis for federal jurisdiction in this case and each of Armco's claims relate to the TORCO contract, all claims must be submitted to arbitration before coming before this Court.[2]

CSX and TORCO's motion largely follows Conrail's analysis in its Motion to Stay Proceedings Pending Arbitration. However, the crux of the motion focusses on Armco's failure to proceed earlier on its claims. CSX points out that Armco had the opportunity to enter a virtually identical lawsuit in the early 1980's. An Armco legal inter-office memorandum referred to earlier counseled against entering the lawsuit, citing statute of limitations problems under the federal antitrust laws. If this were the case in 1983, the statute of limitations problem would pose a more serious problem today. However, CSX contends

that tying the alleged conspiracy into the TORCO contract which is still effectively and conceivably still damaging Armco, is an attempt to avoid the statute of limitations problem. Therefore, the TORCO contract is, indeed, central to the resolution of this case.

The "first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985). Although it is clear that antitrust claims may be arbitrated[3], the Court must still determine what claims the parties intended to submit to arbitration.[4]

Despite its alleged knowledge of the defendants' antitrust violations, Armco's agreement to submit claims under the TORCO contract to arbitration does not obligate it to arbitrate disputes arising prior to execution of the TORCO contract. *See Church v. Gruntal & Co.*, 698 F.Supp. 465, 469 (S.D.N.Y.1988) (arbitration clause not applicable to complaint for actions taken prior to execution of contract providing for arbitration of "any controversy ... arising out of or relating to [ ] contract"); *Necchi S.P.A. v. Necchi Sewing Machine Sales Corp.*, 348 F.2d 693, 698 (2d Cir. 1965), *cert. denied*, 383 U.S. 909, 86 S.Ct. 892, 15 L.Ed.2d 664 (1966) (claims based on conduct which had occurred "prior to" execution of contract containing arbitration

---

**2.** Defendants also raise issues concerning certification of the question concerning the Valentine Act's statute of limitations and the coordination of discovery between the arbitration proceedings and the proceedings before this Court. The Court shall not certify the question concerning any applicable statute of limitations under the Valentine Act since the language of the statute is unambiguous in that it specifically states that "no statute of limitation shall prevent or be a bar to any suit or proceeding for any violation [of the Act]." The Ohio Attorney General has read the clear language of the statute to impose no statute of limitations under the Act. Further, in his ruling on the defendants' motions for judgment notwithstanding verdict in the multidistrict litigation, Judge Fullam held that "the statute plainly precludes the defense that

any of the plaintiffs' claims under the Valentine Act are time-barred." *In re Lower Lake Erie Iron Ore Antitrust Litigation*, 759 F.Supp. 219 (E.D.Pa., 1991) (Fullam, J.).

**3.** *Id.*, 473 U.S. at 629, 105 S.Ct. at 3355.

**4.** Any alleged "intertwining" of Armco's TORCO contract claim with the other claims of its complaint does not require the Court to submit the entire complaint to arbitration. The "intertwining" approach to arbitration was rejected by the Supreme Court in *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985), where the Court held that the parties' intent governs "even if the result is 'piecemeal' litigation."

agreement not encompassed by agreement.)

■ Further, arbitration is not required merely because the acts giving rise to some of Armco's claims allegedly occurred prior to the execution of the TORCO contract. A party's agreement to arbitrate disputes "arising under or relating to" one contract does not obligate it to arbitrate disputes arising under a separate contract. *See In re Hops Antitrust Litigation*, 655 F.Supp. 169, 171–72 (E.D.Mo.1987) (arbitration clause requiring arbitration of "any dispute arising out of or relating to this agreement" did not require arbitration of plaintiff's claims relating to contracts which did not contain an arbitration clause.)

■ In this case, the TORCO contract requires Armco to unload at the TORCO facility all iron ore moved by vessel on the Great Lakes. Its term is 25 years. The transportation contract between CSX and Armco for inland transportation of iron ore, on the other hand, requires Armco to move all of its domestic ore inland from the TORCO facility on CSX rail lines, regardless of whether the order was shipped by vessel to the facility. The term of this contract is for five years. It does not contain an arbitration clause. These differences between the contracts disprove the defendants' assertions that the contracts are intricately intertwined and must, therefore, be sent to arbitration together.

■ The remaining issue for the Court, in regard to arbitration, is whether Armco's claims specifically concerning the validity of the TORCO contract must be submitted to arbitration. Paragraph 10(B) of the TORCO contract provides: "This Agreement shall be governed by and construed in accordance with the laws of the State of Ohio." There is nothing in the record to suggest that the choice of law provision was not intended to be fully applicable to the arbitration clause. *See Yates v. Doctor's Assocs., Inc.*, 193 Ill.App.3d 431, 140 Ill.Dec. 359, 549 N.E.2d 1010 (1990). The plaintiff contends that Ohio

law specifically requires the parties *not* to submit the dispute to arbitration when the dispute concerns the validity of the entire contract. *See Campbell v. Automatic Die & Prods. Co.*, 162 Ohio St. 321, 55 O.O. 195, 123 N.E.2d 401 (1954); *Margus Co. v. City of Strongsville*, No. 46450 (Ohio Ct.App., Nov. 17, 1983).[5] Armco contends that its agreement to submit disputes "arising out of or relating to" the TORCO contract does not encompass a claim that the underlying agreement is illegal and void under the antitrust laws. The Court agrees.

In *Volt Information Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), the Supreme Court held that a state law providing for a stay of arbitration during a related court litigation was not preempted by the FAA when the parties agreed that the arbitration agreement would be governed by state law. *Id.*, 109 S.Ct. at 1255. The Court held that the district court could apply a state procedural rule since it neither offended the broad federal policy in favor of arbitration nor was otherwise preempted by any specific provisions of the FAA. *Id.* at 1255–56.

In *Flight Systems v. Paul A. Laurence Co.*, 715 F.Supp. 1125 (D.D.C.1989), Judge Harris, while recognizing that "[t]he question whether the FAA displaces state law ... even when the parties have agreed to arbitrate in accordance with state law, has been in debate." *Id.* at 1127. Citing *Volt*, Judge Harris applied state law to an agreement to arbitrate after determining that the state law did not directly conflict with the goals of the FAA. In applying state law, the Court recognized that *Volt* stands for the proposition that the FAA only requires the parties to arbitrate what they agreed to arbitrate. By including the Ohio choice-of-law provision, the parties indicated their intention to arbitrate to the extent allowed by Ohio law. Under *Volt*, this choice is not preempted by the FAA policy in favor of arbitration. *See Saturn Distrib. Corp. v. Williams*, 905 F.2d 719,

---

5. The Ohio Arbitration Act, like the Federal Arbitration Act, provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Ohio Rev. Code Ann. § 2711.01 (Anderson 1979).

727 (4th Cir.1990) ("[P]arties are entitled to incorporate state law restrictions into their arbitration agreement that would otherwise be preempted by the FAA.")

■ While application of Ohio law would relieve the parties of their responsibility under the contract to arbitrate, it is clear that every state law which affects the arbitrability of a dispute is not preempted by the FAA.

■ The Court today holds that the FAA does not compel parties to arbitrate when the parties have chosen to be governed by state law and the state law relieves the parties of the responsibility to arbitrate when there is an allegation that the contract itself is a product of a violation of the antitrust laws. While there is a strong federal policy favoring arbitration, there are instances when arbitration would further manifest injustice. The underlying goal of the FAA is to encourage parties to submit freely to a neutral arbitration process. When the contract requiring arbitration is allegedly not entered into freely, the goals of the FAA are subverted. Requiring a party who alleges to have been coerced into a contract to submit to the terms of the contract, at least when there are allegations of antitrust violations, would be inequitable. Ohio law indeed supports the underlying values and goals of the FAA.

Accordingly, the parties to the TORCO contract shall not be compelled to arbitrate all issues concerning the contract and this Court shall not stay this action.

(3) *Defendant Bessemer and Lake Erie Railroad Company's Motion to Dismiss or, in the Alternative, to Transfer to the Northern District of Ohio*

Defendant Bessemer moves to dismiss Armco's complaint on the grounds that: (1) this Court lacks personal jurisdiction over Bessemer and the venue is improper, and (2) Armco's federal claims are time-barred and the Court lacks any valid jurisdictional basis to entertain any remaining state law claims against Bessemer. For the reasons stated below, the Court shall deny Bessemer's Motion to Dismiss but shall grant its

motion, in the alternative, to transfer this action to the Northern District of Ohio.

A. Whether the Court Lacks Personal Jurisdiction

Bessemer contends that the Court lacks personal jurisdiction over Bessemer since it fails to meet any of the bases for asserting personal jurisdiction: (1) statutory authorization under § 12 of the Clayton Act; *or* (2) fall within D.C. long-arm statute; *and* (3) meets the minimum contacts standard to comport with due process.

Armco's complaint asserts the following jurisdictional basis:

Each of the defendants resides, is found, has an agent, does or transacts business in or is otherwise found in the District of Columbia, or is subject to the jurisdiction of the Court by reason of actions taken within the District of Columbia. Certain of the unlawful acts alleged in this complaint were performed or had effects within the District of Columbia.

■ Section 12 states that an antitrust suit can be brought in the judicial district of which it is either an *inhabitant,* in a district where it is *found,* or in a district in which it *transacts business.* The D.C. long-arm statute presents similar requirements. Bessemer is not a D.C. corporation and therefore does not qualify as an inhabitant. Also, Bessemer is not "found" in the District. "Found" has been defined as having a "presence" or as engaging in "continuous local activity." *Mylan Laboratories, Inc. v. Akzo,* 1990–1 Trade Cas. (CCH) ¶ 68,981, 1990 WL 58466 (D.D.C.1990). Bessemer is not a D.C. corporation and is not licensed to do business in the District.

Although the Court holds that Bessemer is not "found" in the District, Armco contends that it is "transacting business" within the District of Columbia.

1. *Membership in Trade Association*

■ Armco contends that Bessemer's membership and participation in the activities of the Association of American Railroads qualifies as "transacting business" in the District. A corporation "transacts business" in a district only if its

business therein is of a "substantial character." *Chrysler Corp. v. General Motors Corp.*, 589 F.Supp. 1182, 1195 (D.D.C.1984). The defendant's limited contact with the association cannot and does not constitute contact of a "substantial character." The association acted on behalf of Bessemer and the other defendant railroads insomuch as it lobbied on behalf of railroad interests and against trucking interests. The association's efforts to draw attention to the weaknesses of truck transportation, on behalf of Bessemer and the other railroads, was and is a natural outgrowth of its position as an advocacy organization. If, in the process of highlighting the benefits of railroad transportation, the association also highlighted the weaknesses of trucking transportation, these actions on behalf of Bessemer and the others cannot stand as an independent basis for jurisdiction. The Court concludes that the AAR functions as a typical trade association on behalf of an entire industry, not as a business agent representing Bessemer specifically in discrete commercial activities "integral to the conduct of [Bessemer's] business." *National Constructors v. National Electrical Contractors Association, Inc.*, 498 F.Supp. 510, 527 (D.Md.1980). There is no specific evidence that the association was acting as an agent of the defendant. Therefore, this is an inadequate basis for this Court to assert jurisdiction over Bessemer.

### 2. *ICC Tariff Filings*

 Armco asks this Court to assert jurisdiction over Bessemer based on Bessemer's contacts with the federal government in the District of Columbia. Specifically, in this regard, Bessemer's contacts with the District of Columbia are limited to the filing of tariffs with the Interstate Commerce Commission (hereinafter, "ICC") and the presence of a non-employee, statutory agent on whom ICC notices may be served. These contacts cannot provide the basis for personal jurisdiction over Bessemer pursuant to the "government contacts doctrine" which exempts contacts with Washington which are solely contacts with the jurisdiction because this is where

the government is. *See Investment Co. Institute v. United States*, 550 F.Supp. 1213, 1216–17 (D.D.C.1982) (government contacts defined as "getting information from or giving information to the government, or getting the government's permission to do something"; filings with S.E.C. fall within "government contacts" exception to personal jurisdiction); *Traher v. DeHavilland Aircraft of Canada, Ltd.*, 294 F.2d 229 (D.C.Cir.1961) (single corporate representative in the District whose duties were to serve as liaison to federal government covered by "government contacts" exception.) Since both tariff filings and the presence of an agent to receive ICC notices are required by a federal statute, they cannot constitute voluntary acts by which Bessemer subjects itself to the local laws of the District of Columbia. *See Tavoulareas v. Comnas*, 720 F.2d 192, 195 (D.C.Cir.1983).

In *U.S. v. Baltimore & Ohio RR*, 538 F.Supp. 200 (D.D.C.1982), Judge Parker applied the exception to the government contacts exception in holding that tariff filings which were filed to further an illegal purpose were not "legally compelled":

> Just as false statements can violate a particular statute, so too can tariff filings which are the product of collusive rate-making violate the Sherman Act.... In either case the filing with the federal agency properly gives rise to venue in the district in which the filing was made.

*Id.* at 204 and n. 6.

However, in the multidistrict litigation, Judge Fullam, applying D.C. law in the Pennsylvania multidistrict civil litigation, *In re Lower Lake Erie Iron Ore Antitrust Litigation*, MDL 587 (E.D. Pa., July 23, 1985), expressly disagreed with Judge Parker and held that the ICC filings were, indeed, compelled since the "defendant was required to file tariffs with the ICC before it could charge plaintiffs *any* amount. So at least in part, the filed tariffs were legal, unlike false and misleading statements filed with the SEC, which are wholly improper." *Id.* at 6. Judge Fullam distinguished the case on which Judge Parker relied, *SEC v. National Student Market-*

*ing Corp.,* 360 F.Supp. 284 (D.D.C.1973). He noted that in that case, the defendant was charged with the specific offense of unlawful filings with a government agency. In the multidistrict litigation, as well as in the case before the Court today, this is not the case.

The Court, therefore, holds that Bessemer's ICC filings do not stand as a basis for this Court's assertion of jurisdiction over Bessemer. The Court finds Judge Fullam's analysis compelling and notes that the distinction between Judge Parker's case and the multidistrict litigation is identical to the distinction between Judge Parker's case and the case now before this Court. Further, the Court is wary of asserting jurisdiction over Bessemer based solely on its ICC filings. An assertion of jurisdiction on this basis would bring too many corporations within the jurisdiction of the District of Columbia simply by virtue of its position as the seat of the nation's government. *See MCI Communications Corp. v. American Telephone & Telegraph Co.,* 1983–2 Trade Cas. (CCH), ¶ 65,652 (D.D.C.1983) (government contacts doctrine applied to tariff filed with the FCC even though filing was specifically alleged to constitute an act in furtherance of the conspiracy).

Given the well-founded policy reasons in favor of applying the "government contacts" doctrine,[6] the Court upholds the application of the doctrine to Bessemer's contact with the District.

### 3. *July 26, 1976 Meeting*

■ Armco finally asks this Court to assert jurisdiction over Bessemer on the basis of a meeting in Washington, D.C., held July 6, 1976, at which Bessemer and some of the defendants allegedly discussed their response to the developing truck competition for the inland movement of iron ore.

The Court rejects this basis for jurisdiction and refers to Judge Fullam's July 23, 1985, order rejecting an identical assertion:

> In my view, the single meeting in the District is simply too tenuous to constitute "transacting business" there..... [I]n "practical everyday" terms (*see United States v. Scophony [Corp.],* 333 U.S. [795] at 807 [68 S.Ct. 855, 861, 92 L.Ed. 1091] [ (1948) ]), the attendance at one meeting at which defendant railroads discussed the potentially harmful effects of trucking competition and formed a committee to study the problem simply falls short of the standard, which requires the defendant to be engaged in "substantial business operations" in the forum.

The Court again agrees with Judge Fullam's analysis and finds it unnecessary to deal further with this tenuous assertion of jurisdiction.

### B. Significance of Bessemer's Nolo Plea

■ Bessemer also asserts that Armco's claims are time-barred due to Bessemer's 1982 *nolo* plea. Bessemer contends that various actions taken prior to and subsequent to the *nolo* plea constitute an effective withdrawal from any alleged conspiracy.

First, Bessemer contends that it admitted in court that it fully comprehended the type of activity described in the indictments and indicated that it "has conformed its conduct accordingly." Second, Bessemer contends that it instituted new internal institutional procedures after the plea. Third, Bessemer states that it promised not to become involved in any type of violation of the antitrust laws.

■ It is well settled that withdrawal from a conspiracy may be established by "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in

---

**6.** The Court of Appeals addressed the policy concerns in *Environmental Research International, Inc. v. Lockwood Greene Engineers, Inc.,* 355 A.2d 808 (D.C.1976):

> to permit our local courts to assert personal jurisdiction over nonresidents whose sole contact with the District consists of dealing with a

federal instrumentality not only would pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national judicial forum.

*Id.* at 813.

a manner reasonably calculated to reach co-conspirators." *United States v. United States Gypsum Co.*, 438 U.S. 422, 464–65, 98 S.Ct. 2864, 2887, 57 L.Ed.2d 854 (1978). "Withdrawal requires 'either the making of a clean breast to the authorities, ... or communication of the abandonment in a manner reasonably calculated to reach co-conspirators,' " *United States v. Mardian*, 546 F.2d 973, 978 n. 5 (D.C.Cir.1976), *quoting United States v. Borelli*, 336 F.2d 376, 388 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965). Merely ceasing to participate in the ongoing activity of a conspiracy is not enough to demonstrate withdrawal. *United States v. Garrett*, 720 F.2d 705, 714 (D.C.Cir. 1983), *cert. denied*, 465 U.S. 1037, 104 S.Ct. 1311, 79 L.Ed.2d 708 (1984).

■ Bessemer bears the burden of proof of proving the affirmative defense of withdrawal. *United States v. Finestone*, 816 F.2d 583, 589 (11th Cir.), *cert. denied*, 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987). The test for withdrawal is "stringent," [7] and Bessemer's burden is "rigorous." [8] The defendant cannot set in motion a criminal scheme and then limit its responsibilities for the harm caused by the scheme by simply ceasing to participate in the scheme. In *United States v. Patel*, 879 F.2d 292 (7th Cir.1989), *cert. denied*, 494 U.S. 1016, 110 S.Ct. 1318, 108 L.Ed.2d 494 (1990), the Court held that the defendant had not met this standard, as a matter of law, despite the fact that he had ceased participation, turned informant and had cooperated with the government in making telephone calls to co-conspirators which led to their arrest. *Id.* at 293.

With this standard in mind, the Court cannot hold, as a matter of law, that Bessemer unequivocally withdrew from the conspiracy. In entering a plea of *nolo contendere*, Bessemer never specifically admitted its guilt. Instead, Bessemer simply did not contest the charges against it. Bessemer has never conceded and still does not concede that it ever participated in the unlawful conspiracy alleged by Armco. To the contrary, Bessemer appealed its *nolo contendere* plea on the grounds that its actions were not illegal. *United States v. Bessemer & L.E.R.R.*, 717 F.2d 593, 599 (D.C.Cir.1983). In addition, throughout the following civil litigation and as the only one of four defendants in the multidistrict litigation to go to trial, Bessemer vigorously contested plaintiffs' allegations, proclaiming its innocence and denying liability for its actions. Bessemer argued that there had been no conspiracy and, if one did exist, it did not participate and, if it did participate, it withdrew.

The Court cannot hold that these actions, taken by Bessemer, constitute, as a matter of law, an unequivocal withdrawal from the alleged conspiracy. Further, the Court cannot hold, as a matter of law, that Bessemer adequately informed its co-conspirators of its withdrawal from the conspiracy and disavowal of the purpose of the conspiracy. Despite the fact that, on certain occasions, a Court may find, as a matter of law, that a conspirator withdrew from the conspiracy, this is not the case with Bessemer. There is no evidence before the Court that Bessemer ever affirmatively acted to defeat the goals of the alleged conspiracy. There is no evidence before the Court that Bessemer terminated the employment of the unindicted co-conspirators named in the government's bill of particulars, nor is there evidence that they were disciplined in any way. Further, if there is such evidence, it is outside the pleadings and should be considered on a motion for summary judgment and not on a motion to dismiss. Bessemer's plea and subsequent actions in the civil litigation were ambiguous, at best, concerning Bessemer's position concerning the alleged conspiracy.

The Court holds that the ambiguities of Bessemer's plea and subsequent actions are best left to the jury or further discovery to resolve. *See United States v. Stone*, 444 F.Supp. 1254, 1256 (E.D.Wis.), *aff'd mem.*, 588 F.2d 834 (7th Cir.1978)

---

**7.** *United States v. Juodakis*, 834 F.2d 1099, 1103 (1st Cir.1987).

**8.** *United States v. Lowell*, 649 F.2d 950, 960 (3d Cir.1981).

(alleged scheme and conspiracy is not determinable without trial of general issue and resolution of issue of withdrawal on motion to dismiss inappropriate.) The Court shall, therefore, deny Bessemer's motion to dismiss on grounds of withdrawal.

### C. Motion, In the Alternative, to Transfer

■ In the alternative, Bessemer moves this Court to transfer this action to the Northern District of Ohio, pursuant to 28 U.S.C. § 1404(a).[9] There is no dispute that this action could have been brought in the Northern District of Ohio. For the reasons stated below, the Court shall grant Bessemer's Motion to Transfer and issue an order transferring this matter to the Northern District of Ohio.

As a general matter, the burden is on the moving party to demonstrate that the "balance of convenience of the parties and witnesses and the interest of justice are in [its] favor." *Consolidated Metal Products, Inc. v. American Petroleum Institute,* 569 F.Supp. 773, 774 (D.D.C.1983). In balancing these interests, the Court normally accords deference to the plaintiff's choice of forum. *Harris v. Republic Airlines, Inc.,* 699 F.Supp. 961, 963 (D.D.C. 1988). However, such deference is "greatly diminished when the activities have little, if any, connection with the chosen forum." *Consolidated Metal Products, Inc. v. American Petroleum Institute,* 569 F.Supp. at 775. As Judge Gesell stated in *Islamic Republic of Iran v. Boeing Co.,* 477 F.Supp. 142 (D.D.C.1979):

In weighing claims of convenience, the Court recognizes the diminished consideration accorded to a plaintiff's choice of

forum where, as here, that forum has no meaningful ties to the controversy and no particular interest in the parties or subject matter.

*Id.* at 144.

It is clear from the discussion above that the District of Columbia has little, if any, connection to the activities alleged in Armco's complaint.[10] First and foremost, the controversy involves alleged restraints on the transportation of iron ore to, over, and from iron ore docks on lower Lake Erie. It is equally apparent that the District of Columbia is not Armco's "home turf." [11] Likewise, the District has little or no connection with any of the defendants in this action. In fact, aside from the July 6, 1976 meeting and the defendants' contacts with the AAR, Armco never asserts that any of the parties have a substantial connection with the District of Columbia. Given the minimal connection the controversy has with the District of Columbia, the Court shall not accord great deference to Armco's choice of forum and shall simply weigh the facts, as set forth in § 1404(a) in determining the most appropriate forum for this action.

■ In determining whether a case should be transferred under § 1404(a), the Court may consider the following factors:

[T]he convenience of the witnesses of plaintiff and defendant; ease of access to sources of proof; availability of compulsory process to compel the attendance of unwilling witnesses; the amount of expense for willing witnesses; the relative congestion of the calendars of potential transferee and transferor courts; and other practical aspect of expeditiously and conveniently conducting a trial.

---

**9.** 28 U.S.C. § 1404(a) provides:

For the convenience of the parties and witnesses, in the interest of justice, a District Court may transfer any civil action to any other District or division where it might have been brought.

**10.** As the Court has already stated, the July 6, 1976, meeting does not constitute a meaningful contact with the District of Columbia for the purpose of jurisdiction. It also does not constitute sufficient contact with the District of Co-

lumbia to overcome the logistical preference for transferring this case to the Northern District of Ohio.

**11.** The deference accorded the plaintiff's choice of forum is diminished even further when "the plaintiff has brought suit in a forum which is not its 'home turf.'" *Magee v. Essex–Tec Corp.,* 704 F.Supp. 543, 547 (D.Del.1988), *quoting Shutte v. Armco Steel Corp.,* 431 F.2d 22, 24 (3rd Cir.1970).

*SEC v. Page Airways, Inc.,* 464 F.Supp. 461, 463 (D.D.C.1978).

Other factors include the pendency of related actions in the transferee forum,[12] and the transferee's familiarity with the governing laws. Nearly all of these factors weigh in favor of transferring this action to the Northern District of Ohio and nearly none of these factors warrant keeping this action in this Court.

Although the alleged conspiracy began in the 1950's and several of the witnesses are no longer in Ohio,[13] it is clear that many of the fact witnesses still reside in Ohio. If nothing else, witnesses who will probably testify concerning damages alleged by Armco will most likely be found in Ohio, especially since Armco has alleged that the conspiracy continue to the present day and, concomitantly, injuries continue to the present day. Further, the district court in Ohio will be in a far better position to subpoena nonparty witnesses than this Court. *See Kirschner Bros. Oil, Inc. v. Pannill,* 697 F.Supp. 804, 808 (D.Del.1988) ("comparative abilities of the transferor and transferee forums to subpoena nonparty witnesses is a critical factor in determining the interests of justice" in deciding a § 1404(a) motion).[14]

Another factor strongly warranting transfer is the familiarity of the Ohio District Court with the Ohio law which must be applied in this case. Already, this Court has had to refer to Ohio law, specifically, the Valentine Act, in considering the pending motions. Although transferring the case to the District Court in Ohio is not the same as transferring the case to an Ohio state court, the District Court in Ohio is surely more familiar with the application of Ohio law than this Court. *See Van Dusen v. Barrack,* 376 U.S. 612, 645, 84 S.Ct. 805, 824, 11 L.Ed.2d 945 (1964).[15]

■ The key to Armco's argument against transfer is that counsel and counsel's document depositories are located in the District of Columbia. The location of counsel carries little, if any, weight in an analysis under § 1404(a). *See Islamic Republic of Iran v. Boeing Co.,* 477 F.Supp. at 143–44 (inconvenience experienced by counsel "of minor, if any, importance under § 1404(a)"). As for the location of the documents, that location in the District did not apparently hinder plaintiff's counsel in the multi-district proceedings. Further, since the TORCO contract apparently was not litigated in the earlier civil cases, it is likely that documents concerning that particular contract are still located in Ohio.

Finally, this Court must defer to the more compelling interest of the state of Ohio in having this localized controversy decided at home. Although there are certain minimal facts which this Court has held to be sufficient for jurisdictional purposes, the majority of operative events and the important decisions relative to violations of United States and Ohio law took place in Ohio. This factor, along with the others enumerated by this Court tilt the scales in favor of transferring this action to the Northern District of Ohio.

### Conclusion

For the reasons set forth above, the Court shall deny Conrail's Motion to Stay

**12.** *See Comptroller of Currency v. Calhoun First National Bank,* 626 F.Supp. 137, 141 (D.D.C. 1985) (H. Greene, J.)

**13.** Several witnesses have retired to Florida.

**14.** Armco contends that this factor should receive less importance since defendants called only three live fact witnesses during the liability phase of the multidistrict litigation. This fact may, instead, counsel in favor of transfer since, with the trial in Pennsylvania, Bessemer could not compel the appearance of critical fact witnesses from the six Ohio-based plaintiffs or from Ohio-based vessel companies or other third parties. Testimony was presented by Bessemer in the form of read depositions. Bessem-

er should be afforded the opportunity to revise its trial strategy and call more live witnesses in its defense in this case brought by Armco.

**15.** Familiarity with the complex factual issues involved also warrants transfer to the Northern District of Ohio. While District of Columbia courts have had no involvement with any related cases since 1984, the last of the cases in the Northern District of Ohio did not conclude until late April, 1990. Further, a related case has recently been brought in Ohio state court by a dock company plaintiff. *See Pacific Great Lakes Corp. v. Bessemer and Lake Erie Railroad Co.,* No. 90–189590 (Ct.Com.Pl., Cuyahoga Co., 5/9/ 90).

Proceedings Pending Arbitration, CSX and TORCO's Motion to Dismiss and Bessemer's Motion to Dismiss. The Court shall grant Bessemer's alternative Motion to Transfer to the Northern District of Ohio.