D. Lamar DELOACH, et al., Plaintiffs,

v.

**PHILIP MORRIS COMPANIES, INC., et al., Defendants.**

No. Civ.A. 00–294(GK).

United States District Court, District of Columbia.

Nov. 30, 2000.

Alexander John Pires, Jr., Conlon, Frantz, Phelan & Pires, Washington, DC, Thomas Adam Isaacson, Robert Lamar Green Jr., Robert F. Ruyak, Alan Mitchell Wiseman, Howrey, Simon, Arnold & White, Washington, DC, for plaintiffs.

Douglas Lewis Wald, Arnold & Porter, Washington, DC, for Philip Morris Companies, Inc.

Donna Elizabeth Patterson, Douglas Lewis Wald, Arnold & Porter, Donald L. Flexner, Boies & Schiller, L.L.P., Washington, DC, for defendants.

Peter Joseph Kadzik, Dickstein, Shapiro, Morin & Oshinsky, LLP, Washington, DC, Jeffrey L. Willian, Stephen R. Patton, Kirkland & Ellis, Chicago, IL, Kenneth N. Bass, Kirkland & Ellis, Washington, DC, Donald Flexner, Boies & Schiller, L.L.P.,

Washington, DC, David Boies, Boies, Schiller & Flexner, L.L.P., Armonk, NY, for Brown & Williamson Tobacco Corp.

Peter Joseph Kadzik, Robert Bruce Holcomb, Dickstein, Shapiro, Morin & Oshinsky, LLP, Washington, DC, for Lorillard Tobacco Co.

### MEMORANDUM OPINION

KESSLER, District Judge.

Plaintiffs [1] bring this putative class action on behalf of what they claim to be hundreds of thousands of tobacco growers and quota holders in the Southeast United States and elsewhere, alleging that Defendant tobacco companies [2] have unlawfully conspired, from before 1996 through the present, to engage in various anti-competitive activities, including bid-rigging, at tobacco auctions sponsored by the United States Department of Agriculture. This matter is before the Court on Joint Defendants' Motion to Transfer this action to the United States District Court for the Middle District of North Carolina. Upon careful consideration of the Motion, Opposition, Reply, and the entire record herein, for the reasons stated below, Defendants' Motion to Transfer is **granted.**

### I. Statement of Facts

Seven named Plaintiffs bring this as a putative class action on behalf of themselves and all other persons and entities who have held a quota to grow, or have sold, flue-cured or burley tobacco in the United States "at any time from February 1996 to the present" Second Am.Compl. ("Compl.") ¶ 19. The putative class includes, but is not limited to, the 5,930 persons named in the original and first amended complaints. [3] *Id.*

The following is a brief description of Plaintiffs' allegations. According to Plaintiffs, all individuals or entities who wish to produce tobacco must hold a "quota," which specifies the amount and type of tobacco that can be grown each year. Plaintiffs allege that this quota is a "property right," and that quota holders may, subject to certain restrictions, sell or lease their right to grow certain types of tobacco. Compl. ¶ 32.

The United States Department of Agriculture ("USDA") sets the quota for both burley and flue-cured tobacco each year based on a rigid three-part formula, with little or no room for discretion, and then allocates a *pro rata* quota among the individual quota holders. Compl. ¶ 34. Plaintiffs allege that quota holders "generally" sell their tobacco at auctions sponsored by the USDA, which, according to Defendants, occur primarily in Georgia, Florida, Kentucky, North Carolina, South Carolina, Tennessee, and Virginia (*i.e.*, the Southeast United States). Compl. ¶ 36; Mem. of Law in Support of Def.'s Joint Mot. to Transfer ("Def.'s Mem.") at 8. According to Plaintiffs, cigarette manufacturers must bid above a "minimum price" at these auctions, and if no such bid occurs, the unsold tobacco is purchased by an "agricultural co-operative at the minimum price" and is then placed into a reserve. Compl. ¶ 37.

The primary anti-competitive act of which Defendants are accused is "bid rig-

---

1. Named Plaintiffs are D. Lamar DeLoach, William G. Hyman, Hyman Farms, Inc., Guy W. Hale, James R. Smith, Houston T. Everett, and D. Keith Parrish.

2. Defendants are Philip Morris, Inc. ("Philip Morris"), R.J. Reynolds Co. ("RJR"), Brown & Williamson Tobacco Co. ("Brown & Williamson"), and Lorillard Tobacco Co ("Lorillard,").

3. Plaintiffs first filed their class complaint on February 16, 2000. The initial complaint ex-

plicitly named 4,010 plaintiffs as part of the putative class. On May 3, 2000, Plaintiffs amended their complaint, adding another 1,920 plaintiffs to the class, bringing the total named plaintiffs to 5,930. Plaintiffs' second amended complaint, for which a motion for leave to file was granted on September 7, 2000, contains seven named Plaintiffs but is brought on behalf of the 5,930 named in the original and first amended complaints, as well as all others similarly situated.

ging." Plaintiffs allege that Defendants—who are all ostensible competitors—"communicate with each other before tobacco auctions to discuss, coordinate, exchange information, including price information, and rig the auction" by agreeing on specific bid prices for Plaintiffs' tobacco, which none of Defendants will exceed. Compl. ¶ 43.B. This results in a "tie-bid" (*i.e.*, all bids being the same amount) Compl. ¶ 43.E. Plaintiffs also allege that Defendants punish, boycott and retaliate against those who refuse to abide by the terms of the bid-rigging scheme. Compl. ¶ 42.I.

Plaintiffs allege that the conduct described above (the bid rigging and general anti-competitive conduct) allows Defendants to limit their purchases at auctions, which causes more tobacco to be placed into the "discounted reserve program." Compl. ¶ 45. Plaintiffs further allege that Defendants' anti-competitive acts have allowed them to "lower their purchase intentions submitted to USDA each year since 1997," which in turn lowers Plaintiffs' yearly tobacco quota. Compl. ¶ 46. According to Plaintiffs, the goal of Defendants is to destroy or eliminate the USDA tobacco program, an outcome that would permit Defendants to exercise greater monopsony power. Compl. ¶ 47. Based on Defendants' alleged anti-competitive actions, Plaintiffs bring two claims under the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2.

## II. Legal Standard

■ Defendants seek to transfer this case pursuant to 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The burden is on the moving party to demonstrate that transfer would be proper. *Reiffin v. Microsoft Corp.*, 104 F.Supp.2d 48, 50 (D.D.C.2000) (citing *Air Line Pilots Ass'n v. Eastern Air Lines*, 672 F.Supp. 525, 526 (D.D.C.1987)). However, this Court retains substantial "discretion" as to whether to grant a motion to transfer, and should adjudicate such motions "'according to individualized, case-by-case consideration of convenience and fairness.'" *Hawksbill Sea Turtle v. FEMA*, 939 F.Supp. 1, 3 (D.D.C.1996) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988)); *Chung v. Chrysler Corp.*, 903 F.Supp. 160, 164 (D.D.C.1995).

## III. Analysis

■ The present lawsuit may be transferred to the Middle District of North Carolina only if it could have been brought there. 28 U.S.C. § 1404(a). Accordingly, the threshold question is whether this suit could have been brought in the proposed transferee district. *Kafack v. Primerica Life Ins. Co.*, 934 F.Supp. 3, 5 (D.D.C. 1996) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964)); *Chung v. Chrysler Corp.*, 903 F.Supp. 160, 162 (D.D.C.1995). The present suit is based on federal question jurisdiction, *see* Compl. ¶ 2, and therefore may be brought in "a judicial district where any defendant resides, if all defendants reside in the same State." 28 U.S.C. § 1391(b)(1). As it is uncontested that because each Defendant transacts business in the Middle District of North Carolina, it is subject to personal jurisdiction there, *see* Def.'s Mem at 12, each Defendant is deemed to be a resident of that district for diversity purposes. 28 U.S.C. § 1391(c). Accordingly, "all defendants" reside in North Carolina, and venue is proper in the Middle District of that state.

■ Before considering the traditional transfer factors, it is important to note that although a plaintiff's choice of forum is ordinarily accorded a significant degree of deference, numerous cases in this Circuit recognize that such a choice receives substantially less deference where the plaintiffs, as here, neither reside in, nor have any substantial connection to, that forum. *See Reiffin*, 104 F.Supp.2d at 52;

*Hawksbill Sea Turtle,* 939 F.Supp. at 3; *Chung,* 903 F.Supp. at 165; *Comptroller of Currency v. Calhoun First Nat'l Bank,* 626 F.Supp. 137, 140 n. 9 (D.D.C.1985); *Islamic Republic of Iran v. Boeing Co.,* 477 F.Supp. 142, 144 (D.D.C.1979) (noting that plaintiff's choice of forum is accorded "diminished consideration" where that forum "has no meaningful ties to the controversy and no particular interest in the parties or subject matter") (citations omitted).

■ For the following reasons, the Court concludes that the customary deference is not warranted in this case. First, none of the named Plaintiffs or identified class members reside in the District of Columbia. *See* Def.'s Mem. at 4. Only a relatively tiny number of unidentified class members resides in the District. of Columbia. *See* Pl.'s Mem. of Points and Auth. in Opp'n to Def.'s Joint Mot. to Transfer ("Pl.'s Mem.") at 14 (stating that approximately 516 quota holders, and apparently no tobacco growers, reside in the District of Columbia).

Second, the only real connection this lawsuit has to the District of Columbia is that a federal agency headquartered here (USDA) is charged with generally regulating and overseeing the tobacco auction process, and Defendants are allegedly acting in a way that undermines the applicable USDA regulatory scheme. *See* Pl.'s Mem. at 15, 34–36.

Significantly, Plaintiffs have not indicated that the USDA or any of its employees have a significant day-to-day role in observing, managing or running these auctions. Nor have they demonstrated that the District of Columbia has a stronger interest in the outcome of this lawsuit than it would have in any other complex litigation which in some manner implicates a federal regulatory scheme.

Upon examination of Plaintiffs' most recent complaint, this case appears to be, above all else, an antitrust lawsuit accusing one group of entities of colluding against a large number of individuals and organizations. It is the tobacco growers and quota holders, not the USDA, that are and would continue to be harmed by Defendants' alleged unlawful actions. Accordingly, since only a minuscule number of putative class members resides in the transferor forum, Plaintiffs' choice in this case is accorded little, if any, deference.

■ When deciding whether to transfer a case to another federal district court, this Court is not limited to the three factors expressly enumerated in § 1404(a) (*i.e.,* the convenience of the parties, the convenience of the witnesses, and the interest of justice). *Kafack,* 934 F.Supp. at 6. Rather, the Court can expand its analysis to other important factors, such as

ease of access to sources of proof; availability of compulsory process to compel the attendance of unwilling witnesses; the amount of expense of unwilling witnesses; the relative congestion of the calendars of potential transferee and transferor courts; and other practical aspect[s] of expeditiously and conveniently conducting a trial.

*Chung,* 903 F.Supp. at 163–64 (quoting *Armco Steel Co., LP v. CSX Corp.,* 790 F.Supp. 311, 323 (D.D.C.1991)). Consideration of the these factors demonstrates that transfer would be appropriate and "in the interest of justice" in this case.

First, the absence of compulsory process over a significant number of witnesses favors transfer. It is uncontested that the vast majority of individuals who have actually witnessed and actively participated in the tobacco auctions that form the factual nucleus of this antitrust lawsuit reside outside of this Court's 100 mile subpoena range and are employed by non-party entities. Accordingly, these individuals—including leaf buyers, auctioneers, warehousemen, and ticketmarkers—could not be compelled to testify at a trial in the District of Columbia. *See* Reply Brief in Support of Def.'s Mot. to Transfer ("Def.'s Reply") at 17. More of these potential witnesses reside in North Carolina than in

any other state, and many of those who do not, reside within 100 miles of the Middle District of North Carolina. *Id.;* Kornegan Aff. ¶ 6.

The testimony of these individuals will concern the mechanics and history of the auction process, the ability of warehouse-men and auctioneers to control and/or manipulate the auction process, the explanation of "tie bids," and the way in which tobacco is allocated when tie bids do occur. Def.'s Reply at 17–18. In other words, such testimony will likely be crucial to establish or rebut the existence of Defendants' collusive activity. *Id.* at 18.[4]

Plaintiffs' attempt to minimize the compulsory process problem by theorizing that these individuals have a strong incentive to appear in court voluntarily, including in the District of Columbia, because they value their business relations with Defendants. *See* Pl.'s Mem. at 21–23. However, Plaintiffs' hypothesis is plainly speculative. The mere fact that leaf buyers and other non-party individuals allegedly "work in extremely close and friendly cooperation" with and "obey directions" from Defendants, Pl.'s Mem. at 23, does not guarantee that those individuals would voluntarily travel significant distances to testify under penalty of perjury, especially when they are being accused of engaging in unlawful activity. Further, it can hardly be denied that it would be more convenient for those witnesses to testify in North Carolina, where many of them live, than in the District of Columbia. The relative convenience of the parties' witnesses is a factor of particular importance in deciding motions to transfer. *See Chung,* 903 F.Supp. at 164 ("The most critical factor to examine under 28 U.S.C. § 1404(a) is the convenience of the witnesses.").

Second, the convenience of the parties would best be served by transferring the action to North Carolina. A substantial percentage of both named and unnamed Plaintiffs are residents of North Carolina—more than any other state. Not a single named Plaintiff is a resident of the District of Columbia, and only a fraction of the unidentified putative class members (approximately 516 out of many hundreds of thousands) reside in this jurisdiction. Pl.'s Mem. at 14. It is uncontested that Defendants transact a substantial amount business in North Carolina and all are residents of that state for venue purposes.[5]

Third, the most persuasive factor supporting the appropriateness of transfer is the fact that, regardless of whether North Carolina is the perfect jurisdiction in which the action should proceed, it is far superior to the District of Columbia, which has at best a very attenuated connection to this lawsuit.

As the following uncontroverted facts demonstrate, Plaintiffs' allegations are far more likely to constitute a "matter of great public concern" to the citizens of North Carolina than to the citizens of the District of Columbia. *See Hawksbill,* 939 F.Supp. at 4. Of the 5,930 putative class members explicitly identified in Plaintiffs' original and first amended complaints, more of them (approximately 37%) reside in North Carolina than in any other state. Def.'s

---

4. The Court recognizes that the testimony of certain USDA employees residing in the District of Columbia could potentially be helpful in this case, and that it would be more convenient for those individuals to testify in the District of Columbia rather than North Carolina. However, Plaintiffs have identified only five such individuals. Pl.'s Mem. at 27–28. Given the overwhelming number of potential witnesses with first-hand knowledge of the auction process who reside in or around North Carolina, the convenience of the witnesses favors transfer.

5. The fact that counsel for both parties have offices in the District of Columbia is virtually irrelevant for purposes of deciding the present motion. *See Reiffin,* 104 F.Supp.2d at 52 ("The location of counsel carries little, if any, weight in an analysis under § 1404(a).") (citing *Vencor Nursing Ctrs., LP v. Shalala,* 63 F.Supp.2d 1, 6 n. 4 (D.D.C.1999) (internal quotations omitted)).

Mem. at 4. None of them resides in the District of Columbia. *Id.* "[O]f the flue-cured and burley tobacco growing states, North Carolina is the largest tobacco producer, with close to 40% of all such tobacco output." *Id.* Approximately one-third of the warehouses that hold the tobacco auctions are located in North Carolina, and "approximately two-thirds (2/3) of all flue-cured tobacco auctions take place in warehouses located in North Carolina." Def.'s Mem. at 8. The auctions require the active involvement of auctioneers and ticket markers, approximately half of whom reside in North Carolina. *Id.* at 8–9. None of these individuals resides in the District of Columbia.

The purchasing and processing of tobacco by Defendants occurs almost exclusively in and around North Carolina. Defendant RJR is headquartered and has its principal place of business in North Carolina. *Id.* at 4. All of its "tobacco purchasing operations and records, and all but one of its tobacco purchasing employees" are located in the Middle District of North Carolina. *Id.* Defendant Lorillard is headquartered and has its principal place of business in North Carolina, and its tobacco "purchasing operations and personnel are all located in the Middle District of North Carolina." *Id.* at 5. Defendant Brown & Williamson buys its tobacco through a wholly-owned subsidiary,[6] the operations and processing facilities of which are located in North Carolina. *Id.* at 4. Defendant Philip Morris maintains its tobacco purchasing operations in Virginia, but "purchases more tobacco in North Carolina than in any other states and maintains a local field office for leaf purchasing" in North Carolina. *Id.* at 5. Tobacco is neither grown nor purchased at any auction in the District of Columbia.

Finally, Plaintiffs' contention that transfer would "seriously disrupt the case," Pl.'s Mem. at 11, rings hollow. For highly complex litigation, this case is in its relative infancy at a mere nine and a half months.[7] The Court has held only a single status conference. The Court has not yet made any substantive rulings and has only set a briefing schedule, with which the parties have already complied. Only three motions are currently pending, one of which (a motion for class certification) is not yet ripe, and another of which (Defendants' motion to dismiss the second amended complaint) only recently became ripe and has not yet been considered by the Court. The Court has the utmost faith in the transferee Court's ability to effectively and expeditiously manage the case from this time forward.

## IV. CONCLUSION

For the reasons stated above, the Court concludes that the convenience of the parties and witnesses, the concerns of the citizens of North Carolina, and the interests of justice are best served by transferring this claim to the United States District Court for the Middle District of North Carolina. Accordingly, Defendants' Motion to Transfer is **granted.**

---

6. According to Plaintiffs, this entity (Export Leaf) is not a wholly-owned subsidiary but rather a "division" of Defendant Brown & Williamson. *See* Pl.'s Mem. at 21.

7. It should be noted that the case was transferred to this Court's calendar just over four and a half months ago.